DECISION
This case is before the Court for decision in the continued proceedings on Plaintiff's Motion to Compel Production of Documents Withheld Under Claim of Privilege. At issue are two witness statements, in the form of written memoranda; six purported transcriptions of recorded witness interviews; and the content of three micro-cassette audio recordings of the witness interviews — all of which have been reviewed by the Court, incamera. Also at issue is the pattern of concealment, evasion, and obstruction evidenced by Providence College's discovery responses and representations made to the courts of this State.
 I Facts and Travel A The Events Leading to the Court's In Camera Review of Providence College's Written Witness Statements and Purported Interview Transcriptions
John E. Langley, Jr., as administrator of the Estate of John D. Langley (Plaintiff) brings this action. On December 13, 2002, the Plaintiff's decedent, John D. Langley *Page 2 
(Langley or John Langley), a student at Providence College, (Providence College or College) gained access to his dormitory's attic and fell from the dormitory roof. Providence College security officers secured the attic and kept the media from the campus. The Providence Police Department responded to the incident, treating the dormitory and immediate area as a potential crime scene. In the days following the incident, an outstanding issue was the identity of one of the two other students who were with Langley during the evening he fell. Similarly at issue were questions concerning what, if anything, Providence College had known about students' use of the attic or other unauthorized areas in the past and, if so, what steps it had taken to prevent them from doing so in the future.
At the time of the incident, Reverend Stuart McPhail, O.P. (McPhail or Rev. McPhail) was the Vice President of Student Services. College Vice President and General Counsel Marifrances McGinn (Attorney McGinn or McGinn) was the College's risk manager. According to his affidavit, Rev. McPhail contacted McGinn, advising her that he believed Langley's family would attempt to hold Providence College responsible for Langley's death and would sue. (Aff. of Rev. Stuart McPhail, O.P., November 6, 2007.) The stakes were high: Providence College's responsibility, civil or criminal, for the wrongful death of one of its students would have repercussions beyond mere economic damages. Thereafter, in the days immediately following the incident, Providence College conducted an investigation concerning the circumstances surrounding John Langley's death — thus committing the witnesses' observations and accounts of pertinent events to the College's institutional memory. *Page 3 
As part of the investigation, McGinn and Associate General Counsel Gail Dyer (Attorney Dyer or Dyer) interviewed a number of witnesses, including students, parents, College officials, and College employees. Although the total number of interviews ultimately conducted and the identity of the interviewees remain unknown, McGinn and Dyer made notes and audio-cassette recordings memorializing discussions among themselves, and at least three other College officials and several lower echelon College employees. Providence College officials whose interviews were recorded included Vice President of the College and Dean of Residence Life, Reverend Kenneth Sicard (Sicard, Fr. Sicard, or Reverend Kenneth Sicard); Assistant Dean of Residence Life, Kevin Hillery (Hillery); and St. Joseph Hall Director and member of the College's Residence Life Central staff, Ernest McNair (McNair). In addition, Vice-President and Chief Financial Officer Michael V. Frazier (Frazier) prepared a one page written account of the events, entitled Observations of St. Joseph's Hall, dated December 13, 2002 at 9:39 a.m., that was directed to McGinn and McPhail. Similarly, Kevin Hillery prepared a one page memorandum, dated December 15, 2002, that was directed to Fr. Sicard. So, too, Ernest McNair provided a one page letter bearing a date of December 13, 2002. Other employees known to be interviewed included campus security officers David Marshall (Marshall), David Petit (Petit), John Dunbar (Dunbar), and Joseph McDonald (McDonald); College project manager Carl Russo (Russo); St. Joseph Hall Residential Assistant, Edmund St John (St. John); and physical plant employee-locksmith, Martin Toupin (Toupin). Of these seven lower echelon employees, the interviews of Marshall, Petit, St. John and Toupin are known to have been recorded. *Page 4 
The first audio-cassette recording was transcribed by a Providence College legal secretary, Mary Caprio, within three days of the initial interview. She transcribed others several weeks later. Regardless, all of the transcriptions were maintained, electronically, in the College's computer system. In addition, as the interviews were transcribed, hard copies of the transcriptions were printed, reviewed by Attorney Dyer, and thereafter maintained in a paper file kept by her. See Letters of Attorney Kristie M. Passalacqua, dated May 22, 2008 and June 11, 2008.
Of the written statements, those of Kevin Hillery and Michael Frazier are the subject of the instant motion. Likewise, the recorded statements of Ernest McNair, Edmund St. John, Kevin Hillery, David Petit, David Marshall, Martin Toupin, and Reverend Kenneth Sicard are in contest.
The written accounts and recorded interviews contained detailed discussions of the facts, circumstances, and events surrounding John Langley's death, and the observations that the Providence College officials and staff members made at the time. Included was information highly pertinent to the questions of when the College learned students were accessing the attic and what Providence College had done to prevent them from doing so. All of the written accounts and recorded interviews contained an exchange of factual information — much of it highly damaging and cross-substantiating.
In February 2003, Private Investigator Richard H. DiNatale went to the College in an attempt to conduct interviews and take photographs on behalf of the Plaintiff. Mr. DiNatale was advised by Attorney McGinn that the College campus was private property, and she informed him that she would call the Providence Police if he did not leave the campus immediately. Attorney McGinn then personally escorted Mr. DiNatale off the *Page 5 
property, thus curtailing the Plaintiff's own investigation into the facts and circumstances surrounding John Langley's death. College staff members were informed of the incident, and they were told to refrain from discussing or speculating about the anticipated litigation amongst themselves. According to Providence College's defense counsel, staff members were not instructed to refrain from speaking with the Plaintiff or his representatives. See Defendant Providence College's Reply Memorandum in Opposition to Plaintiff's Motion to Compel Production of Documents Withheld Under Claim of Privilege, 4, November 7, 2007 (Def.'s Mem. in Opp'n).
The Plaintiff filed suit in late 2005, and the instant litigation ensued. The factual details about how Langley gained access to the dormitory attic and was able to climb out onto the roof became of critical importance in the case, as did questions about when Providence College learned its students were using the attic as an unauthorized retreat and what it had done to prevent them from doing so. Not surprisingly, much of the Plaintiff's pre-trial discovery requests focused on the identity of and knowledge possessed by the College's many officials, staff members, students, and former-students.
Only after two years of litigation and multiple hearings on discovery questions, did it come to light that the audio-cassette recordings and memoranda, previously undisclosed to the Plaintiff, were in existence. Providence College resisted producing these and other materials, asserting various objections and privileges with respect to them. The College produced a privilege log, claiming that the documents identified in it "were specifically and solely generated in anticipation of litigation at the direction of counsel and for no other purpose" (Answer to Interrog., August 7, 2007, privilege log) and, further, that the documents would be withheld pursuant to the attorney-client *Page 6 
communications and work-product privileges. In addition to the two written memoranda directly at issue herein, included among the documents over which Providence College asserted its privilege claims was the one-page statement of Ernest McNair, dated December 13, 2002. Providence College also asserted that the recorded interview of Reverend Kenneth Sicard, O.P., conducted by Attorney Dyer, and Kevin Hillery's December 15, 2002 memorandum to Fr. Sicard were protected by the priest-penitent privilege.
Thereafter, the Plaintiff filed a Motion to Compel Production of Documents Withheld Under Claim of Privilege. During the course of several months and at least two hearings on the motion, Providence College withdrew some of its objections. The privilege log was revised at least once, in part because, according to Providence College, Attorney Dyer's notes of her interviews of David Marshall, Joseph McDonald, and John Dunbar had only recently been discovered. See Letter of Attorney Kristie M. Passalacqua, dated January 2, 2008. Ultimately, still in contest were the two witness statements that had been reduced to written memoranda and the audio-cassette recordings — the latter of which had been transcribed by Providence College, purportedly accurately — for a total of seven documents.[1]
The motion was argued on January 10, 2008, at which time Providence College's attorneys pressed both its attorney-client communications and attorney work-product privileges. In the context of attorney work-product privilege, it was Providence College's *Page 7 
contention that the statements and transcripts constituted materials prepared in anticipation of litigation and were therefore, discoverable only upon a showing of "hardship." The College argued that the Plaintiff could not demonstrate the hardship necessary to overcome that privilege and, further, that any hardship the Plaintiff may have experienced was self-induced. In support of this, Providence College and its attorneys asserted that they had been abundantly forthcoming when producing the College's discovery responses, boasting that they had supplemented its answers to the Plaintiff's interrogatories nine times over the course of two years. Their assertions and representations to the Court were in keeping with their objection papers in which they also affirmatively represented to the Court that
 "Defense counsel, in coordination with the Office of General Counsel, has worked diligently to collect, review, organize, and produce all factual information that relate in any way to the claims and defenses in this case." (Def.'s Mem. in Opp'n 10.)
Providence College and its attorneys further represented to the Court that they had
 ". . . provided lengthy summaries for each of the approximately ninety (90) fact witnesses it has identified. Consistent with these efforts, the Defendant has provided detailed summaries for the [witnesses] identified in the privilege log []. . . ." Id.
They further represented that:
 "The Defendant has fulfilled all of its discovery obligations by providing the Plaintiff with the factual information in its possession relating to these [witnesses] as well as to all other fact witnesses about which it has knowledge." Id. at 11.
Accepting Providence College's attorneys' representations but consigning itself to a review of the contested materials in camera such that it could articulate the necessary *Page 8 
findings, the Court reserved decision on the motion pending its consideration of the two written statements and the College's proffered version of the contents of the audio-cassette recordings. Because not all communications between attorneys and their corporate clients' employees are privileged, it was necessary for the Court to assess the actual content of the contested materials. Further, even if the Court determined that the contested materials did not constitute privileged communications or contain core attorney work-product, they plainly were materials prepared in anticipation of litigation. Therefore, it would be only by juxtaposing the contents of the materials with Providence College's discovery responses and making findings thereon that the Court could detail, for the record, the extent to which the Plaintiff would or would not suffer undue hardship if denied the materials.
Notably, although Providence College urged the Court to apply the attorney-client communications privilege as a threshold matter and without regard to the actual content of the communications, it did not object to the Court's in camera review of the materials. Nor did it seek a stay from the Court pending application for appellate consideration of the question of whether or not it ought to be compelled to produce the materials to the Court in the first instance.
Providence College submitted a copy of the statements and its proffered transcripts to the Court on January 14, 2008, together with a cover letter of that same date. The transcript copies consisted of three computer print-outs that bore these handwritten notes[2]: "Tape #1 — transcribed 12/19/02. MC."; "Tape #2 Transcribed 1-15 — 16- *Page 9 
03 MC"; and "Tape #3 — Transcribed 2-23 — 25-02 MC." According to the contents of the print-outs, the College transcriber's notes, and the privilege logs, Tape #1 memorialized Dyer's December 16, 2002 interview of Edmund St. John, Ernest McNair, and Kevin Hillery, the time of which is not indicated; Tape #2, Side A memorialized the continuation of the December 16, 2002 interview begun on Tape #1; Tape #2, Side B memorialized the conclusion of Dyer's December 16, 2002 interview of St. John, McNair, and Hillery and Dyer's December 16, 2002 interview of Fr. Sicard. According to the privilege log, the latter interview, that of Fr. Sicard, was incomplete. Tape #3 memorialized Dyer's interview of David Petit, conducted on December 17, 2003, the time of which is not indicated; the interview of David Marshall, conducted on December 18, 2002 at 9:05 a.m.; and Dyer's interview of Martin Toupin conducted on December 18, 2002 at 10:50 a.m. Toupin's interview was also listed in the privilege log as incomplete. For Carl Russo's interview of December 18, 2002, Providence College's privilege log indicated Attorney Dyer had made notes but not a voice recording. According to Providence College's memorandum in opposition, Joseph McDonald was interviewed on December 18, 2002 and John Dunbar on December 19, 2002. (Def.'s Mem. in Opp'n 3.)
A cursory review of the Sicard and Toupin interview transcripts confirmed that the two indeed were incomplete, as noted in Providence College's privilege log. Moreover, the transcriptions purportedly memorializing the interview with St. Joseph Hall Director and member of the College's Residence Life Central staff, Ernest McNair, *Page 10 
were bereft of any statements attributable to him and, seemingly, incomplete — notwithstanding the College had failed to so note that in its privilege log.
Notably, the transcript copies bore several handwritten markings and interlineations, indicating that Attorney Dyer indeed had read the transcripts, checked them for accuracy, accounted for missing words or phrases, and noted the substantive import of the dialog. See also Letter of Attorney Kristie M. Passalacqua, dated June 11, 2008.
The January 14, 2008 letter to the Court was signed by Attorney Kristie M. Passalacqua (Attorney Passalacqua or Passalacqua) on behalf of Providence College's pro hac vice trial attorney, Douglas F. Seaver (Attorney Seaver or Seaver), both of the firm of Hinckley Allen Snyder, LLP. The letter was not certified as having been sent to opposing counsel even though it included additional commentary to the Court regarding the College's objections and copies of case law.
Seaver and Passalacqua's letter also referenced a bound volume simultaneously submitted by them to the Court. The title read as follows: "Documents from Defendant Providence College's Privilege Log. These Documents Have Been Produced for Judge Patricia A. Hurst's In-Camera Review." The volume contained copies of the statements and transcriptions[3] and, with respect to each, excerpts from the College's discovery responses upon which the College relied in refuting the Plaintiff's claim of hardship. The contents of the volume were broken into sections, thus allowing the Court to juxtapose the contents of the statements and interview transcriptions with the discovery responses. *Page 11 
The volume did not bear any certification as having been sent to opposing counsel, even in redacted form.
Included in the volume was Ernest McNair's written statement dated December 13, 2002. That statement appeared in Providence College's privilege logs, and accordingly, the College had refused to produce it. However, in its memorandum in opposition, Providence College withdrew its objection and agreed to produce the document, stating for the first time that the report had been "generated as part of the normal procedure in [McNair's] capacity as Hall Director[]." (Def.'s Mem. in Opp'n n. 3.) McNair's statement was brief and contained only a description of his activities and observations made on the night of December 13, 2002 after John Langley fell to his death.
Providence College's submissions necessarily left the Plaintiff's attorney in the dark — not only with respect to the College's additional commentary to the Court but also with respect to the specific discovery responses the College relied upon — in asserting that it had fully disclosed all of the pertinent facts and information possessed by the witnesses whose statements were at issue. Because both communications were made ex-parte, eliminated was any opportunity for the Plaintiff's attorney to respond or provide the Court with his own analysis of why the relied upon discovery requests were facially deficient.
So, too, Providence College's submission left the Court confounded. With its memorandum in opposition, Providence College obliged the Court with copies of the College's initial discovery response and four of its supplementations. (Def.'s Mem. in Opp'n, Ex. B(1), Ex. B(2), Ex. B(3), Ex. B(4), and Ex. B(5).) However, not all of the *Page 12 
interrogatory questions were contained within them. Interrogatory question No. 1 was missing from each and every one of the College's exhibits, and only interrogatory questions Nos. 2, 3, 4, 5, 6, 7, 8, 9, 13, 14, 16, 17, 18, and 26 could be found among them. Then, it its January 14, 2008 submission, the College included only excerpts from its interrogatory answers and none of the interrogatory questions. Likewise, copies of produced documents, but none of the document production requests, were contained in the submission. Furthermore, the first document contained in the section dedicated to Providence College's purported transcription of Tapes #1 and 2 was Ernest McNair's written letter of December 13, 2002. Because the Court's copy of these transcriptions contained no statements attributable to Ernest McNair, either the College included his statement for some indecipherable purpose or the transcription of Tapes #1 and 2 in fact were incomplete — thus adding to the Court's confusion notwithstanding the statement's seeming consistency with Providence College's interrogatory disclosures regarding this witness.
As a result, the Court could not assess the extent to which the College's discovery responses were forthcoming when compared to the contents of the witness statements and interview transcriptions and whether the Plaintiff, indeed, had been provided with "all factual information that relate in any way to the claims and defenses in this case." (Def.'s Mem. in Opp'n 10.) Therefore, accepting the College's invitation to consider the extent of its disclosure and agreeing with the College that the history and substance of the discovery responses were relevant to the question of hardship, the Court called for copies all of the interrogatory questions and answers. *Page 13 
Initially, the Court twice requested Attorney Passalacqua to provide the Court with complete copies of the Plaintiff's interrogatories and the College's responses. When Passalacqua failed to respond to that request, the Court requested counsel for the Plaintiff to produce them. The Plaintiff's attorney, Daniel Schatz (Attorney Schatz or Schatz), delivered the discovery materials to the Court within several days. As a result of the Plaintiff's submission, the Court now was able to make a meaningful comparison of Providence College's discovery disclosures with the facts and information contained in its witness statements and proffered transcripts to see if, indeed, this comparison shed light on the question of whether or not the Plaintiff is able to obtain the substantial equivalent of the materials by other means.
 B Three of the Providence College Witnesses Were Deposed
Meanwhile, and some sixty days after Providence College's supplemental disclosure[4] concerning security officers David Petit and David Marshall was made, the Plaintiff took the depositions of both security officers. David Petit's deposition was taken on March 5, 2008, and David Marshall's deposition was taken on March 6, 2008. During those depositions, the Plaintiff's counsel, Attorney Schatz, asked both witnesses about conversations they had had with Residential Assistant Edmund St. John on December 13, 2002 immediately after John Langley's fall — facts and information about which were contained in the recorded interviews. Both had forgotten. In response to Schatz's inquiry, Petit stated: *Page 14 
 "I don't remember." (David Petit Dep. 40: 5, March 5, 2008.)
Similarly, Marshall stated:
 "I don't remember talking to him at all." (David Marshall Dep. 49: 18, March 6, 2008.)
During the depositions, Attorney Schatz attempted to lock on to any documents the two reviewed in preparation for their deposition testimony. Petit stated, under oath and unequivocally, that he had reviewed a transcript of his interview with Attorney Dyer in preparation of his deposition. Without asking Petit to reveal the substance of what he had viewed, Schatz attempted to determine whether it contained any reference to anything St. John may have said to Petit that night. Providence College's lead defense counsel, Attorney Seaver, objected, claiming attorney-client privilege. In response, Schatz carefully explained that he was not asking the witness to reveal the substance of what St. John said, but rather, only whether the transcript contained any reference to what St John had said. Nevertheless, Seaver remained steadfast and refused to let the witness answer, opining in his presence that the witness must be mistaken about what he saw. Seaver stated:
 "I think what he was shown was Answers to Interrogatories which contained whatever information the interrogatory answer had to do with him. I don't think he was shown nor do I believe he's seen notes that were taken by counsel; but to the extent that you continue along this line, my instruction is for him not to answer." (David Petit Dep. 41: 14, March 6, 2008.) *Page 15 
So, too, David Marshall testified quite firmly that it was the transcript of his interview with Dyer he reviewed the day of his deposition. However, later in his deposition, he stated that it was the interrogatory responses that he had viewed.
After the Petit and Marshall depositions closed, Petit and Marshall both made changes to their deposition testimony. They completed errata sheets that, in essence, changed the words, "interview transcript" to "interrogatory answer." The Plaintiff filed a Motion to Strike the changes to the deposition testimony and strike the errata sheets. That motion was heard and denied by this Court on April 30, 2008. During the hearing, Attorney Seaver represented to the Court that Providence College had shown the witnesses Providence College's interrogatory answers concerning them and not the transcripts of their actual statements — thus confirming that Providence College indeed had prepared the witnesses by showing them the College's version of the events and not their original statements.
Similarly, Martin Toupin's deposition was taken on March 27, 2007, approximately one year after Providence College's disclosure relating to him.[5] The transcript of his deposition was included in the Plaintiff's materials offered in support of the instant motion. According to the deposition transcript, Toupin remembered next to nothing about the events leading up to or surrounding John Langley's death. When asked, specifically, if he repaired or installed a lock on the door to the attic of St. Joseph Hall prior to 2002 — information contained in his recorded interview — Toupin replied: "I don't recall." (Martin Toupin Dep. 27: 25; 28:1 March 27, 2007.) Toupin testified that he did not know if Providence College conducted an investigation concerning John Langley's *Page 16 
death, id. at 12:12, and further testified that he did not recall having been interviewed. Id. at 12:20. He testified that he met with Dyer but did not recall when. Id. at 13:11. When asked if he had been shown any documents in preparation for his deposition, Toupin testified that he met with Dyer and Attorney Seaver together, but they had shown him Providence College written work orders only. Id. at 14:16; 15:4.
 C The Court's Interim Ruling of May 12, 2008; Providence College's Proffered Transcripts Were Obviously Incomplete
During a hearing that took place on May 12, 2008, the Court rendered a bench ruling in which the Court quickly rejected Providence College's attorney-client communications arguments. See Bench Decision, May 12, 2008. Then as part of its work-product and hardship analysis, the Court laid out the deficiencies in Providence College's discovery responses as exposed by the contents of the proffered transcriptions; commented on the high probative value of the facts and information contained in the witness statements and transcripts; identified statements, comments, and questions that could constitute possible attorney work-product; and ruled that the proffered transcripts and witness statements — such as they were — must be produced, subject to certain redactions. The Court briefly articulated the legal basis for the ruling. It seemed plain enough that the Plaintiff was unable to obtain the wealth of facts and information contained in the statements and transcripts within the framework of the discovery process — a process that should have proved the most reliable means of obtaining the facts and information known to or possessed by Providence College's employees and agents. *Page 17 
More specifically, the statements and proffered transcriptions contained discoverable facts and information that had been withheld from Providence College's discovery responses and which fell into eight basic categories: (1) material concerning how long Providence College employees and officials knew students had been accessing the attic; (2) College officials' observations of personal property items and other indicia of use found in the attic in previous years; (3) details concerning the steps the College had taken to prevent students from accessing the attic and the particulars evidencing how the attic could be accessed; (4) the existence of and clues to the identity of one of the other two students who was with John Langley during the evening he fell, and the identity of witnesses to whom he spoke and in whose presence he made statements; (5) findings made by Residential Assistant Edmund St. John in early November 2002 and again on December 12, 2002, concerning the security of the attic door and what he did about both; (6) information pertaining to written and verbal work orders having to do with securing the attic door but which had not been carried out at the time of Langley's death; (7) statements made to or in the presence of other College employees by Edmund St. John and Ernest McNair, concerning students' ability to access the attic in the past and the College's failure to secure the door; and (8) the identity of the individuals who were in St. John's and McNair's presence when he made those statements.
During this May 12, 2008 hearing, the Court also directed Providence College to produce for it the original audio-cassette recordings. As noted previously herein, it was evident that the transcripts were incomplete and that portions of the recorded interviews had been omitted from them. With respect to Ernest McNair, in particular, the cover page to the College's January 14, 2008 in camera submission indicated that he was interviewed *Page 18 
but, inexplicably, no statements of substance were attributed to him in the proffered transcripts. Although judging from McNair's witness statement and the discovery disclosures about him that Seaver and Passalacqua had included in their volume of materials and which indicated to the Court that McNair possessed post-incident information only, it seemed certain that his recorded statements would be of little consequence.
In addition, portions of the proffered transcript showed that the transcriber was unable to determine who was speaking at times and could not always make out what the participants had said. Having not had the opportunity to listen to the witnesses' actual statements and with the accuracy of the proffered transcripts now in question, the Court therefore ordered the original audio-cassette recordings produced forin camera listening and review. Plainly, it was the actual content of the witness interviews, and not merely the College's proffered version of them, that was at issue.
In addition and due to the Court's concern about the deficiencies in Providence College's discovery responses, the Court directed all of Providence College's attorneys, including Seaver, Dyer, McGinn, and local attorney William Grimm, a senior attorney in the firm of Hinckley Allen Snyder, LLP, to sign all future pleadings. The Court called Providence College to task and insisted that the discovery practices evidenced by the interrogatory responses be brought to a halt.
Finally, the Court ordered and the parties agreed that the Court's order requiring the statements and transcripts to be produced to the Plaintiff would be stayed until the Court completed its in camera review of the original recordings, finally ruled on the *Page 19 
Plaintiff's motion, and thereafter, the College had an opportunity to prepare and file a petition for writ of certiorari with the Rhode Island Supreme Court.
Providence College did not object to or request a stay of the Court's order to produce the original audio-cassette recording for in camera
review.
 D The Tapes Get Mixed Up
On May 19, 2008 the College delivered to the Court a letter from Attorney Kristie M. Passalacqua, stating that
 "Pursuant to your Bench Decision of May, 12, 2008, enclosed please find copies (emphasis added) of the audio-cassette tapes that recorded Associate General Counsel Gail Dyer's interviews with various Providence College employees and administrators in December of 2002.
 In reviewing the copies that we made for the Court for clarity, we uncovered that Side B of Tape 1 was never transcribed. Therefore, we are in the process of having Side B transcribed professionally. We will provided [sic] the Court with a copy of this transcript as soon as we receive it. Side B of Tape 1 recorded part of Attorney Dyer's December 16, 2002, interview of Father Sicard, Ernest McNair, Ed St. John, and Kevin Hillery." (Letter of Attorney Kristie M. Passalacqua, dated May 19, 2008.)
Two days later, on May 21, Attorney Passalacqua delivered a second letter and, included with it, what purportedly was an accurate transcript of Tape #1, Side B, a continuation of Dyer's interview of McNair, St. John, and Hillery. In the letter, Passalacqua stated:
 "When we learned on Monday, May 19, 2008, that Tape 1, Side B had never been transcribed, we sent the tape out to Capitol Court Reporting for transcription. We then added in the margin the names of the individuals we believe made *Page 20 
the statements transcribed." (Letter of Attorney Kristie M. Passalacqua, dated May 21, 2008.)
Then, in response to the Court's follow up request for the original
audio-cassette recordings as had been ordered, and not copies as purportedly had been delivered, Attorney Passalacqua sent clarification in a third letter dated May 22, 2008. In that letter, Attorney Passalacqua explained that as the result of a last minute and unforeseen switch, the original audio-cassette recordings indeed had been delivered to the Court, and it was the copies that had been sent out for professional transcription. Attorney Passalacqua stated:
 "Although it is contrary to what I stated in my May 19, 2008 letter to you the audio-cassette tapes you received on Monday afternoon were Providence College's original tapes. Initially, I had intended to deliver copies of the tapes to you, and keep the originals in our file. However, when we discovered that Side B of Tape 1 had not been transcribed, I sent out our only copy of Tape 1 out to Capitol Court Reporting in Warwick, Rhode Island, for transcription. Capitol's courier had not returned with the tape by 4:10 p.m. and our office assistant needed to leave for Court to hand-deliver the tapes to you. Therefore, at the very last minute, I decided that we would give you the original tapes. I did not want to mix the originals with the copies, so I sent you all three original cassette tapes." (Letter of Attorney Kristie M. Passalacqua, dated May 22, 2008.)
Thus, the copies of the audio-cassette recordings that Providence College had meant for the Court were sent to the Capitol Court Reporting; the original audio-cassette recordings, meant to be kept by Providence College, were sent to the Court. *Page 21 
 E Providence College's Second Proffered Transcript Yields a Smoking Gun but Nonetheless Contains Inaccuracies and Omits Pertinent Material
Among other things, Providence College's missing transcript contained explosive material pertaining to questions concerning when and how Providence College first learned or obtained information that students might be accessing the attic. It also included statements made by Ernest McNair, evidencing the forseeability of students' unauthorized use of portions of the College's physical plant that were meant to be off-limits to them. The transcript also confirmed Sicard's presence throughout Dyer's and McGinn's interview with Ernest McNair, Edmund St. John, and Kevin Hillary — the three employees possessing direct knowledge, observations, and information concerning the College's role in the events leading up to and surrounding John Langley's death. However, in spite of his actual presence, the information contained in the transcript had been omitted from Providence College's discovery responses.
Notwithstanding that the audio-cassette copy had been professionally transcribed, portions of the newly proffered transcript also appeared incomplete. Portions of the dialog were denoted as "inaudible," and some of it was disjointed and incomprehensible. Furthermore, as indicated in Passalacqua's cover letter, the reporter had not identified the participants by name and, instead, identified each speaker by gender[6]
only — thus requiring Providence College's attorneys to listen to the recording, identify the speakers by voice, and interlineate on the transcript, by hand, their names. Finally, the transcript bore no reporter's certification due to the fact it had been sent to Providence College's attorneys electronically and thereafter printed and interlineated by them. As a result, the *Page 22 
Court directed Providence College to produce a certified transcript, a copy of the reporter's ASCII[7] disk, and the original transcript print-outs for in camera review. The College produced these without objection, but the materials failed to cast any light on the reliability of the newly proffered transcripts — thus requiring the Court to undertake the process of comparing the transcript with the original audio-cassette recording now in the Court's possession.
A cursory comparison of the original audio-cassette recording with Providence College's newly proffered transcript revealed that this new transcript contained inaccuracies and omitted information that were readily perceptible in the original recording delivered to the Court. Further, it was these omissions that had rendered parts of the witnesses' dialog, as it appeared in the transcript, impossible to make out. Seemingly, either the inaccuracies and omitted information had been overlooked by the reporter, or the audio copy sent to her was in some way defective. So, too, the College's attorneys missed or ignored these inaccuracies and omitted information when they printed the transcript and compared it to their copy of the audio-cassette recording for the purpose of identifying the speakers.
An equally cursory comparison of the original audio-cassette recording with Providence College's previously submitted transcripts revealed that those transcripts, too, contained inaccuracies and omitted information — yet the College did not offer corrected versions to the Court.
With Providence College's entire series of proffered transcriptions now thrown into controversy, the Court began its examination of all of the original audio recordings, reviewing them for content, accuracy in transcription, and omitted dialog *Page 23 
 F F The Proceedings of May 30, 2008
The Court's initial review of the College's newly proffered transcript led it to the same conclusion it had reached with respect to the first set of transcripts: that the attorney-client communications and work-product privileges did not apply and that Providence College's discovery responses were lacking. The Court provided a partial analysis of the newly produced transcript in its bench ruling on May 30, 2008.See Proceedings, May 30, 2008. Once again, it seemed plain enough that the Plaintiff was unable to obtain the critical information contained in that transcript through the discovery process.
More specifically, the newly produced transcription contained discoverable facts and information that had been withheld from Providence College's discovery responses and which fell into four categories: (1) material concerning Providence College officials' awareness about the length of time students had been accessing the attic; (2) details concerning the steps the College had taken to prevent students from accessing the attic; (3) dialog concerning the unidentified third student who was with John Langley during the evening of December 12, 2002; and (4) observations made by College officials concerning personal property items and other indicia of use found in the attic in previous years.
It was during the May 30, 2008 proceedings when the Court advised the parties that depending upon the contents of the tapes vis-à-vis Providence College's proffered transcriptions, new and more accurate transcriptions would have to be prepared. It was impossible to accurately assess the applicability of any privilege claims without first *Page 24 
determining what actually was said during the discussions and creating a reasonably accurate record thereof — a record that could be relied upon by both the appellate court and the Plaintiff. Only from there could the Court revisit questions of attorney-client communications and work-product privileges and finally determine which, if any, portions of the contested materials should be produced. Finally, the Court again made clear its dissatisfaction with the College's discovery responses. As it had done at the time of its May 12, 2008 bench ruling, the Court again stayed its own order and the production of the materials.
The Court's bench rulings of May 12, 2008 and May 30, 2008 were reduced to writing and signed by the Court before being entered by the clerk on June 3, 2008 and June 23, 2008, respectively. The Court made no Super. R. Civ. P. 54(b) findings, and said writings did not purport to be final judgments or orders.
 G Providence College Attempts To Block the Court's Review of the Audio-cassette Recordings
On June 23, 2008, at 4:16 p.m., before the Court had completed its findings on the audio-cassette recordings and made its final ruling and notwithstanding that the Court had twice stayed its own orders requiring the production of the witness statements and purported transcriptions, Providence College filed a petition for writ of certiorari. See Petition for Issuance of Writ of Certiorari. With it, the College asked the Supreme Court to block the trial Court's review of the audio-cassette recordings. See Providence College's Motion for a Stay Pending Appeal and Petition. As grounds, the College *Page 25 
asserted that because the communications took place between Providence College employees and College attorneys, their contents necessarily were privileged, and further, the mere fact of the Court's in camera review of the audio-cassette recordings, in and of itself, imperiled the attorney client privilege and must be brought to a halt.
With its petition, the College submitted a document entitled Providence College's Appendix of Record Materials (Appendix). This document included the College's previously ordered daily[8] transcripts of the hearings of January 10, 2008; May 12, 2008; May 30, 2008; and the November 6, 2007 Affidavit of Stuart McPhail, O.P. in which McPhail had laid out the facts supporting the College's privilege claims.
Included in the Appendix, captioned as if a part of the record in the Superior Court proceedings, was a document that, in fact, had not yet been filed in the Superior Court. The document was entitled Notice of Appeal by Defendant Providence College. This document was of Providence College's own styling and was not the official form notice required by the Supreme Court in all appeals, the latter of which requires the appellant to make affirmative representations concerning the trial court action appealed and to confirm the status of transcript orders. Providence College's purported "notice," certified as having been sent to opposing counsel, made no reference to the status of the transcript and gave no indication, one way or the other, whether the official transcript would or would not be ordered. Nor did the "notice" signify that the appealed orders were not final orders, or that this Court had not completed its rulings.
Three minutes later, at 4:19 p.m. on June 23, 2008, in circumvention of Rules 7 and 8 of the Supreme Court Rules of Appellate Procedure requirement that orders for the *Page 26 
protection of the parties or requests for stay of proceedings must ordinarily be sought in the trial court, Providence College filed in the Supreme Court a document entitled Motion for Stay Pending Appeal and Petition. Thus Providence College forestalled this Court from making a record of three considerations critical to the question of a stay in proceedings: (1) that Providence College had never objected to the veryin camera review it now sought to block; (2) that this Court already had read the College's witness statements and proffered transcripts and had listened to the audio-cassette recordings — thus rendering moot any effort to halt the ongoing proceedings; and (3) that this Court already had stayed any production of the contested materials until such time as a final order had been entered and Providence College could obtain review of a petition for writ of certiorari by the Supreme Court.
At 4:20 p.m. on June 23, 2008, within one minute of Providence College's filing its petition for writ of certiorari, record Appendix, purported "notice," and motion for stay with the Supreme Court, Providence College filed with the Superior Court the original of its self-styled Notice of Appeal by Defendant Providence College. Simultaneously, Providence College hand-delivered an official Supreme Court form Notice of Appeal to a Superior Court clerk.
The official form Notice of Appeal referenced the order dated June 3, 2008, but instead of indicating that the trial court order appealed was a pre-trial motion, incorrectly indicated that a judgment had been entered. Furthermore, the section of the form that requires the filing party to indicate whether or not a transcript would be ordered was left blank, and therefore, the official form Notice of Appeal was incomplete. *Page 27 
Upon delivering the incomplete official form Notice of Appeal to the clerk, the College's representative informed the clerk that the necessary transcripts had been ordered, the fees paid, the transcript received by the Supreme Court, and the appropriate notices sent — implying compliance with Article I, Rules 10 and 11 of the Supreme Court Rules of Appellate Procedure and the established practices and procedures of the Superior Court.[9] Thus lulled, the clerk innocently accepted the College's representation without confirming the truth of the matter through either the Superior or Supreme Court administrators and, instead, scrawled the words, "Fees Paid Transcripts Ordered Received Notices Sent," on the Court copy of the appeal notice. Then, at the instance of and escorted by the College's representative, the clerk immediately transported the case *Page 28 
file to the Supreme Court. Upon its arrival, the Supreme Court clerk accepted the Superior Court clerk's representations that the official transcripts had been ordered, prepared, and transmitted in accordance with the applicable procedures, and she received the case for filing.
The following morning, June 24, 2008, the Supreme Court officially docketed Providence College's appeal. On June 25, 2008, the Supreme Court issued its notice thereof.
The benefits of the lightning speed in which Providence College accomplished the docketing of the case were two-fold. As noted above, it eliminated this Court's opportunity to articulate the considerations relevant to a stay of the proceedings and the Plaintiff's opportunity to make a record in that context. Just as importantly, by circumventing the requirement that the official appeal transcript must be ordered through the Superior Court Administrator in the absence of an agreement by the parties and order of the trial court establishing the record on appeal — a process that necessarily would have delayed the transmission of the record and docketing of the appeal — it effectively blocked the Court from making a further record of the actual contents of the audio-cassette recordings, the deficiencies in the College's proffered transcriptions, and the deficiencies in Providence College's discovery responses.
On July 3, 2008, the College's Attorney Seaver, caused a copy of the Supreme Court notice of docketing to be hand-delivered to this Court and, as if the Court needed education in this, informed the Court in a cover letter that "with the filing of the appeal *Page 29 
the entire record[10] from the Superior Court has been transmitted to the Rhode Island Supreme Court," reminding that "jurisdiction is now at [sic] the Supreme Court." See Letter of Attorney Douglas F. Seaver, dated July 2, 2008.
On July 8, 2008, a new attorney entered an appearance in the Supreme Court proceedings as appellate counsel for Providence College. In obvious recognition of the College's failure to properly order the official transcript, he filed with the Supreme Court a document entitled Motion to Augment the Record. In it, the College requested leave to substitute its copies of the daily transcripts for what would have been the official version had the transcripts been ordered in accordance with the rules of both the Supreme and Superior Courts. Secure in the fact that it had already deprived this Court of jurisdiction, the College gave no explanation of why it had failed to bring a motion in the trial court, pursuant to Rule 10(e) of the Supreme Court Rules of Appellate Procedure, for an agreed statement that the daily transcript copies could be relied upon in lieu of the record on appeal required by Supreme Court Rule of Appellate Procedure 10(a) — a motion to which opposing counsel would have been hard pressed to object or the Court to deny, but which would have delayed the docketing of the appeal.
 H The Supreme Court Summarily Remands the Case to the Trial Court
The Supreme Court was not in session at the time Providence College's appeal notices and petition for writ of certiorari were filed, but shortly upon reconvening in *Page 30 
September 2008, that Court summarily denied the College's petition and dismissed its appeal. The Supreme Court stated:
 ". . . this matter is not ripe for our consideration. Our examination of the Superior Court hearing transcripts discloses that the hearing justice had not concluded her in camera review of the materials which were the subject of the plaintiff's motion to compel production of documents, and that she had not issued a final ruling on the motion, prior to the abrupt removal of the case from her jurisdiction through the somewhat hurried transmission of the papers to this Court pursuant to the defendant's appeal." (Supreme Court Order, dated September 19, 2008.)
With that, the Supreme Court remanded the case to this Court for it to complete its in camera review of the contested materials and thereafter complete its ruling on the Plaintiff's motion.
 II The Court's Findings upon Review of the Original Audio-cassette Recordings A Providence College's Transcripts Were Incomplete and Omitted Important Information
After the case was remanded by the Supreme Court, this Court resumed its review of the original audio-cassette recordings, listening to them using unsophisticated office dictation equipment. Comparison of the written transcripts submitted on January 14, 2008 and May 21, 2008 against the original recordings confirmed that material had been omitted from the transcripts, including, as Providence College had already admitted, Dyer's entire interview with Ernest McNair as memorialized in Tape #1, Side B. Similarly, with respect to Providence College's Tape #1, Side A transcription, all *Page 31 
indications that Ernest McNair had spoken were omitted or obscured. Remarkably, too, the same was true with respect to Tape #2, Side A, which contained the remainder of the interview. In addition, comparison of the original recordings with the proffered transcripts revealed that material designated as "inaudible" was readily heard and decipherable. Further, words and statements were omitted, and not all of the interview questions and answers were attributed to the correct speaker.[11]
To be sure, Providence College's transcriptions contained garden-variety mistakes often found in transcriptions. However, thorough comparison of both the January 14, 2008 and May 21, 2008 proffered transcripts against the original audio-cassette recordings revealed a commonality among much of the omitted information. Generally and with the exception of what appeared to be genuine typographical or transcription errors, the omitted information fell into five categories: (1) discussions about the police investigation-what the police had been told and by whom; (2) information concerning the unidentified third student who was with Langley that night; (3) the witnesses' knowledge concerning students' use of the attic in previous years; (4) particular details having to do with Ernest McNair's and Edmund St. John's activities and observations; and (5) details surrounding the College's efforts to stop students from accessing the attic prior to December 13, 2003, including information about past difficulties with the door's security, College officials' awareness of the most recent defects in the door's security, and the final, missed opportunity for the College to secure the door just hours before John Langley fell.
Specific material missing from the Providence College transcribed Tape #1, Side A was dialog in which Ernest McNair clearly identified himself and established his *Page 32 
presence in the interview. Thereafter, every reference to McNair's name was omitted and, instead, a question mark ("?") was substituted for his name, indicating the speaker was unknown. Thus eradicated were all links to the formerly missing Side B and any tell-tale signs that an additional recording containing McNair's statement might exist.
Also omitted from Providence College's transcript of Tape #1, Side A was any indication that Fr. Sicard participated in the interview by directing questions to the witnesses. In addition, dialog pertaining to a hasp and padlock that had appeared on the door to the attic in the fall of 2002 was omitted. Further, missing from the transcription was lengthy dialog evidencing Edmund St. John's findings when he inspected the attic door on December 12, 2002. As a result of the latter modifications in particular, the College's proffered transcript left the impression that St. John's findings were the opposite from what was revealed by the omitted dialog. Conspicuously, except for these omissions and several others of the same ilk, the Tape #1, Side A transcript was comparatively accurate.
The professionally transcribed Tape #1, Side B transcript contained noticeably more errors than the College's other transcriptions. Left out of the transcript submitted to the Court were dialog and references to the identity of the College officials to whom Edmund St. John spoke immediately after the incident, other than those to whom he spoke about postponing an exam; the Providence Police investigation; the witnesses' dialog concerning the unidentified third student who was with Langley the night he fell; past work orders and Ernest McNair's reliance thereon; the possible source of McNair's hearsay knowledge about students accessing the attic in the past; and the disappearance of the personal property items and other indicia of student use that Providence College *Page 33 
officials previously had discovered in the attic. As with the proffered transcript for Tape #1, Side A, this transcript omitted any indication that Fr. Sicard participated in the interview by asking questions.
As with Tape #1, Side A, Tape #2, Side A obscured the fact that Ernest McNair had spoken and substituted a question mark ("?") for his name, indicating the speaker was unknown. In addition, omitted were portions of the dialog pertaining to the Providence Police investigation and the witnesses' continued attempts to identify the third student who was with John Langley the night he fell. Finally and as with the College's proffered version of Tape #1, Side A, omitted was dialog pertaining to the hasp and padlock found on the door during the fall of 2002fs.
With respect to Tape #2, Side B, the transcript submitted to the Court was generally accurate — other than the substitution of a question mark ("?") for Ernest McNair's name, again indicating the speaker was unknown. Likewise, the transcripts of Sides A and B of Tape #3 were generally accurate. Substantively, when compared to the contents of Tape #1, Sides A and B and Tape #2, Side A, all three of these recordings were relatively benign. They were the most accurate of all of Providence College's proffered transcriptions.
More so than the transcripts, the audio-cassette recordings make it evident that Providence College's Vice President, Sicard, was present throughout the conversations with St. John, Hillery, and McNair and therefore had direct knowledge of what those witnesses knew about the events leading to John Langley's death, including for how long the College had known about students' accessing the attic, what it had done to stop them, and what went wrong during the day and evening of December 12, 2002. The audio-cassette *Page 34 
recordings also place McGinn in the room during McNair's interview, at least. It is this dialog that most unmistakably gives the lie to Providence College and Sicard's assertions contained in its discovery responses and which reverberated throughout its disclosures:
 ". . . the first time Providence College knew that students were entering the attic or cupola, or climbing onto the roof of St. Joseph Hall was after the Incident of December 13, 2002." (Answer to Interrog. No. 13, February 13, 2006.)
 B The Contents of the Audio-cassette Recordings and Privilege Log Suggest That Additional Recordings May Exist
Further troubling, the contents of the audio-cassette recordings and privilege log suggest that additional audio-cassette recordings may exist. The recording equipment that Dyer used during the interviews played an audible end-of-tape warning before the cassette tape expired. With the exception of two interviews, Toupin's and Sicard's, the contents of the audio-cassette recordings demonstrate that at the end of each recording, Dyer would either turn over the existing tape or replace it with a new one before continuing the interview.
Sicard's December 16, 2002 interview is found at the end of Tape #2, Side B. His conversation with Dyer was interrupted when the tape ran out, and, as noted in Providence College's privilege log, the recording of his statement obviously is incomplete. Sicard's interview was interrupted by the end-of-tape warning while he and Dyer were discussing the timing of John Langley's funeral. Notably, Dyer and Sicard had yet to reach topics, such as Sicard's statements, made in the presence of Michael Frazier, *Page 35 
Kevin Hillery, and Providence College Assistant Vice President for Business and Finance, Warren Gray, during an encounter at St. Joseph Hall the morning after John Langley's death and which pertained to the frequency of students accessing the attic;[12] Edmund St. John's statements made to Sicard during the early morning hours of December 13, 2002; or the College's past response to students' attempts to access prohibited areas of the campus. Indeed, the next numbered audio-cassette tape, Tape #3, Side A, begins with David Petit's interview of the next morning, December 17, 2002. These circumstances suggest that one or more additional audio-cassette recordings may have been made on December 16, 2002, but not transcribed, as Providence College contended was the case with Tape #1, Side B.
Similarly, the December 18, 2002, 10:50 a.m. Toupin interview, recorded at the end of Tape #3 Side B, and also listed in Providence College's privilege log as "incomplete," was interrupted at the end of the tape. The interview was interrupted early on by the end-of-tape warning as Toupin was beginning to recount the facts surrounding his visit to the attic two weeks before John Langley's death. Dyer and Toupin had yet to discuss, for example, the observations Toupin made when he and physical plant employee Carl Russo visited the attic on December 4, 2002 and the fact that they cut off the padlock then securing the attic door; the nature of the work Toupin performed on the attic door at approximately 2:15 p.m. on December 12, 2002; the details of his findings at 5:00 a.m. on the morning of December 13, 2002 when he was called to re-secure the door; and what he did with the door lock. Therefore given Dyer's obvious mission to piece together the facts and circumstances surrounding John Langley's death and her *Page 36 
thoroughness as evidenced by the contents of the other audio-cassette recordings, her failure to record the remainder of her interview with Toupin is inexplicable. Notably, as the recording ended, Dyer's voice is captured saying, "Hold one sec." Toupin responds, "Okay." Under the circumstances, this absence of recording again suggests that there may be additional audio-cassette recordings the existence of which has not been revealed.
Likewise, Dyer's failure to record her interview with physical plant employee Carl Russo seems inexplicable. Russo had been in the attic several times during the months leading up to John Langley's death, including on December 4, 2002, and had knowledge about highly pertinent facts and circumstances. Equally as inexplicable is Dyer's failure to record her interviews of John Dunbar and Joseph McDonald. These two security officers were among the first to arrive on the scene on December 13, 2002 and were in a position to observe important details and overhear statements made by others, including Edmund St. John and Ernest McNair.
Finally, it is clear from the contents of the audio-cassette recording that Dyer was also taking notes during the recorded interviews. Therefore, it cannot be inferred that her notes were made in lieu of recording.
 C The Interviews Did Not Contain Any Give and Take of Legal Advice
Importantly, the contents of the audio-cassette recordings revealed that none of the interviewees had sought out McGinn or Dyer for legal advice but instead had been invited by the attorneys to participate in the recorded discussions. At no time did the any of the interviewees present themselves as corporate employees attempting to determine *Page 37 
how to go about complying with the law or responding to any legal problem that was facing them or the corporation. Nor does the dialog contain any indication that McGinn or Dyer were presently seeking to render legal advice to any of the interviewees or offer them guidance on how to conduct themselves in complying with some law in the future. At no time did any of the participants request that the discussions be kept confidential, or did either McGinn or Dyer at any time inform the interviewees that the discussions would be considered confidential. Neither McGinn nor Dyer made any comments or statements to suggest they were acting in the capacity of the College's legal advisors, as opposed to the capacity of investigators or risk managers. None of the interviewees ever requested legal advice, and not one word of legal advice ever passed McGinn's or Dyer's lips. Nor do the contents of the recordings suggest that McGinn and Dyer were conducting anything more than a broad fact gathering mission or that they approached the interviewees as anything more than bystander witnesses whose knowledge and information they sought to commit to Providence College's institutional memory for possible use in the future. In fact, the only time Dyer revealed her and McGinn's purpose in piecing together the facts surrounding John Langley's death was during David Petit's interview, and even then, her comment was brief and did not suggest she or McGinn were acting in their roles as legal advisors to the College or any of its employees. At no time did Dyer or McGinn treat the witnesses as employees who were in a position to carry out corporate policy or who, by actions within the scope of their employment, could embroil the corporation in legal difficulties in the future — such that they would have the relevant information needed by the attorney in order to adequately advise Providence College with respect to any actual or potential difficulties. Furthermore, there is nothing in the *Page 38 
statements and recorded interviews to suggest that either McGinn or Dyer intended to follow up on them by thereafter providing any legal advice or guidance and nothing to suggest that the witnesses or College officials expected them to do so.
Finally, except for a few possible exceptions, neither Dyer nor McGinn revealed any of their thoughts, mental impressions, opinions, or legal theories enabling the Court to infer from such that either was attempting to convey legal advice to Providence College or its employees. The interview questions were straightforward, with Dyer posing neutral and objective questions aimed at discovering the facts and circumstances leading up to John Langley's death. There are a few spots in the dialog where a cynic could argue that she was attempting to influence the witnesses' view of the events, but the Court took these questions as being more professional-like and direct.
 D Hardship: Providence College's Discovery Responses and the Contested Materials Compared
It is during the discovery process that all parties are expected to disgorge the information requested of them, fully, candidly, and expeditiously. Southern Ry. Co. v. Lanham, 403 F.2d 119, 130 (5th Cir. 1969) (quoting Hickman v. Taylor, 329 U.S. 495, 504 (1947)). Furthermore, with the exception of the first of Providence College's interrogatory answers which were signed by McGinn, all were signed by College Vice President and Dean Reverend Kenneth Sicard, under oath, on behalf of the College. For the College's answers of February 13 and April 4, 2006, following Sicard's signature and as to the objections, appeared the names of Attorneys Grimm, Passalacqua, McGinn, and *Page 39 
Dyer. Thereafter, beginning with the College's answers of August 18, 2006, Attorney Seaver's name also appeared as to objections. In addition, Attorney Passalacqua signed all of the responses pursuant to Super. R. Civ. P. 26(f) that requires "Every discovery request, response, or objection made by a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name . . ." and, further, that "The signature of the attorney . . . constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the request, response, or objections is . . . [c]onsistent with these rules . . . [n]ot interposed for any improper purpose, such as . . . to cause unnecessary delay or needless increase in the cost of litigation. . . ." Under the circumstances, then, the Plaintiff's most reliable means of obtaining the facts and information memorialized in the contested materials should have been the discovery process and interrogatory questions addressed directly to Providence College.
As implicitly recognized by Providence College in its objection to the instant motion, the circumstances of this case necessarily take the Court directly to Providence College's discovery responses. Juxtaposing those responses with the contents of the contested materials is necessary to determining the questions of "hardship" and whether the Plaintiff, indeed, was provided with "all factual information that relate in any way to the claims and defenses in this case." (Def.'s. Mem. in Opp'n 10.) In addition, the manner in which Providence College responded during the discovery process sheds light on the question of whether the Plaintiff reasonably can be expected to acquire the information sought in the future through that same process. Therefore, detailed discussion of the timing, sequence, and substance of the parties' discovery requests and responses is *Page 40 
warranted — as is a comparison of contents of the discovery responses against the contents of the witness statements, proffered transcripts, and contents of the audio-cassette recordings.
 1 Plaintiff's First Set of Interrogatories
Plaintiff John E. Langley, Jr.'s First Set of Interrogatories Propounded to Defendant Providence College (Plaintiff's First Set of Interrogatories), consisting of twenty-six numbered interrogatory questions, was filed on January 4, 2006. Included were detailed introductory instructions. The interrogatory questions pertinent to this motion include:
Interrogatory No. 1:
 "Please [identify] all persons known or believed by you to be a witness to any of the events or conduct pertinent to the allegations in the Complaint or the defenses asserted thereto."
Interrogatory No. 2:
 "Please [identify] all of the persons known or believed by you to possess knowledge or information relating to any of the events, conduct, or facts pertinent to the allegations of the Complaint or the defenses asserted thereto."
Interrogatory No. 8:
 "Please state whether this Defendant or its representative(s), including its insurer(s), have taken recorded or written statements from any individuals identified in response to Interrogatories Nos. 1 through 7. If so, please state:
 a. the name of the person from whom a statement was taken; *Page 41 
 b. the form by which the statement is preserved (written, voice recorded, etc.);
 c. the date the statement was taken;
 d. the person(s) present when the statement was taken;
 e. whether anyone other than this Defendant, its representatives), or its insurer(s) have a copy of the statement.
Interrogatory No. 9:
 "Describe all construction work or maintenance work done of any type on the door or doorway leading to the attic, the attic, the cupola, or the roof of St. Joseph Hall in the calendar years 1998 through and including 2002.
Interrogatory No. 13:
 "When did Providence College first obtain information (including secondhand or hearsay information) that students were able to enter the attic or the cupola, or climb onto the roof of St. Joseph's Hall? Describe such information, the source of such information, individuals who have knowledge or such information, and all documents referring to such information."
Interrogatory No. 15:
 "For the time period January 1, 1998 through December 31, 2003, does Providence College have any information (including secondhand or hearsay information) that indicates in any way that students, in addition to [John Langley], had entered the attic or cupola, or had climbed onto the roof of St. Joseph Hall? If so, identify such information, the source and date of such information, all individuals having knowledge of such information, all documents referring to such information, and identify all students who may have entered the attic or cupola, or climbed onto the roof of St. Joseph Hall. *Page 42 
Interrogatory No. 16:
 "Did Providence College conduct an investigation regarding the death of [Langley]? If so, identify all individuals (and their relationship to Providence College) who conducted the investigation, participated in the investigation, and were interviewed as part of such investigation, and identify all documents relating to the investigation."
Although the case record is somewhat unclear, apparently some of the interrogatory answers were needed, upon shortened time, in advance of a deposition of an individual whose statements are not the object of the instant motion. A hearing took place before another Superior Court Justice, who required Providence College to answer Interrogatories Nos. 8, 9, 14, and 20 on shortened time but only with respect to that witness. Accordingly, Providence College provided its Partial Answers of Defendant Providence College to Plaintiff's Interrogatory Nos. 8, 9, 14 and 20, as They Pertain to David Lamenzo on January 24, 2006.
Notably, the answer was signed by Attorney McGinn, who, in response to Interrogatory No. 8, directly addressed the question of whether or not a written or recorded statement had been taken of the witness and, to that extent, satisfied the clear and unambiguous requirements of Super. R. Civ. P. 26(b)(5).[13] McGinn stated: *Page 43 
 "Defendant objects to this interrogatory on the grounds that it seeks information protected by the work-product privilege and information prepared in anticipation of litigation. Notwithstanding and without waiving said objections, Providence College states that it has not taken a recorded or written statement from Mr. David Lamenzo." (Answer to Interrog. No. 8, January 15, 2006.)
Shortly thereafter, on February 13, 2006, Providence College provided its Answer of Defendant Providence College to Plaintiff John E. Langley, Jr.'s First Set of Interrogatories. Included among Providence College's general objections was an objection to any question that required Providence College to divulge protected information. Specifically, the objection stated:
 "Defendant objects to each and every interrogatory to the extent that it seeks information that is protected from disclosure by the attorney/client privilege or reflects the opinions, strategies or mental impressions of counsel or was prepared in anticipation of litigation." (Answer to Interrog. General Objection No. 1, February 13, 2006.)
In answer to Interrogatory Nos. 1 and 2, Fr. Sicard, on behalf of Providence College, identified scores of individuals including the eight whose statements and interviews are at issue herein.
However, unlike McGinn's earlier answer to Interrogatory No. 8 as it pertained to David Lamenzo, Sicard failed to state, one way or the other, whether written statements were taken or voice recordings made. Instead, Providence College confined its response to a privilege-based objection — in spite of the fact that the interrogatory did not seek protected information and notwithstanding the Colleges' standing general objection to disclosing materials to the extent they were protected by privilege. The objection stated:
 "Defendant objects to this interrogatory on the grounds that it seeks information protected by the work-product privilege, the attorney-client privilege and information *Page 44 
prepared in anticipation of litigation. Defendant objects on the grounds that this Interrogatory contains multiple questions within a single numbered question." (Answer to Interrog. No. 8, February 13, 2006.)
Importantly, Providence College also failed to provide any privilege log that would have satisfied the Super. R. Civ. P. 26(b)(5) requirements attendant to the assertion of privilege claims and moreover would have answered the question by revealing the existence of the statements and recordings at issue herein.
Providence College responded to Interrogatory No. 9 with an objection that stated:
 "Providence College objects to Interrogatory No. 9 on the grounds that it is overbroad, unduly burdensome, and incapable of a meaningful response. Without waiving said objections, Providence College directs the Plaintiff to Providence College Physical Plant Work Orders it will produce with the Defendant's Responses to Plaintiff's First Request for Production. The documents speak for themselves." (Answer to Interrog. No. 9, February 13, 2006.)
Thus Providence College suggested, without saying directly, that the contents of the written work orders would provide the answer to the question.[14] With this response, Providence College avoided disgorging the factual details, memorialized in the written statements and the College's transcriptions, about work performed by Martin Toupin *Page 45 
during previous semesters but which was not reflected in the documents produced to the Plaintiff.
For Interrogatory No. 13, Providence College responded by objecting on the grounds that the question was overly broad and contained multiple questions. Sicard then followed with a limited and partial answer, "notwithstanding objection," stating,
 "The first time Providence College knew that students were entering the attic or cupola, or climbing onto the roof of St. Joseph Hall, was after the incident of December 13, 2002." (Answer to Interrog. No. 13, February 13, 2006.)
Through the combined use of objections and a partial answer that dodged the original question and the details it demanded, Providence College and Sicard avoided disgorging critical facts and information contained in the witness statements and the College's own transcriptions — while falsely pretending that they only had subsequent information and implying that compelling a further answer to the Interrogatory would not be worthwhile. Had Sicard answered Interrogatory No. 13 truthfully and fully-divulging either the contents of the witness statements and College's original transcriptions or what was stated in his presence but which purportedly went un-transcribed in the first instance-he would have been forced to reveal the highly damaging facts and information and witnesses which were memorialized by the witness statements and recorded interviews and demonstrated quite the opposite of what he had stated in his answer. Had Sicard admitted the truth, the element of notice well-nigh may have been eliminated from the controversy and the issue reduced to one of whether or not the College took reasonable steps to prevent students from entering the attic door in light of a known defect in the door's security. *Page 46 
In response to Interrogatory No. 15, Providence College objected, and Sicard again answered:
 "Defendant objects to this Interrogatory on the grounds that it is overly broad and contains multiple questions. Notwithstanding and without waiving said objections, Defendant states that the first time Providence College knew that students were entering the attic or cupola, or climbing onto the roof of St. Joseph Hall was after the Incident of December 13, 2002." (Answer to Interrog. No. 15, February 13, 2006.)
As with Sicard's answer to Interrogatory No. 13, this answer also dodged the question, omitted the important facts and information contained in the witnesses' statements and the College's original transcripts — to say nothing of what was contained in the audio-cassette recordings — and falsely presented Providence College as having subsequent knowledge only.
In response to Interrogatory No. 16, Providence College once again responded with a privilege-based objection and, once again, failed to adhere to the clear and unambiguous requirements of Super. R. Civ. P. 26(b)(5) that required it to identify the witness statements and recorded interviews at issue herein. (Answer to Interrog. No. 16, February 13, 2006.)
 2 Plaintiff's Second Set of Interrogatories
Plaintiff John E. Langley, Jr.'s Second Set of Interrogatories Propounded to Defendant Providence College (Plaintiff's Second Set of Interrogatories) was propounded on February 22, 2006. This set consisted of a single interrogatory only. In it, Plaintiff requested the current addresses of all of the individuals identified in Providence College's response to Interrogatory Nos. 2, 3, 4, 5, and 6 of Plaintiff's First Set of Interrogatories. *Page 47 
The purpose of the question was obvious enough: knowing the identity of a witness is meaningless unless one knows where to find him or her. Although Providence College resisted supplying the addresses of the identified individuals, a detailed analysis of this aspect of its discovery responses is unnecessary for present purposes.
 3 Plaintiff's Third Set of Interrogatories
Plaintiff John E. Langley, Jr.'s Third Set of Interrogatories Propounded to Defendant Providence College (Plaintiff's Third Set of Interrogatories) was propounded just weeks later on March 21, 2006. Plaintiff's Third Set of Interrogatories also consisted of a single interrogatory only. Even more so than the previous interrogatories, it drove straight to the facts and information memorialized in the witness statements and recorded interviews. Truthful and forthright answers to the interrogatory question would have disclosed the many important facts and information contained in the contested materials. Such answers would have permitted the Plaintiff to prioritize his investigation and discovery including depositions. Almost certainly, too, the Plaintiff's search for evidence of "notice" would have been vastly reduced if not eliminated. Specifically, the interrogatory asked:
 "Please state the knowledge or information that Defendant believes is possessed by each individual identified in Defendant's answers to Interrogatory Nos. 1 and 2 of Plaintiff's First Set of Interrogatories." *Page 48 
 4 Providence College's Supplemental Answers
Two weeks later, on April 4, 2006, Providence College provided two separate sets of supplemental answers to Plaintiff's First Set of Interrogatories. One, signed by Sicard on April 3, 2006, was entitled Supplemental Answers and Objections of Defendant Providence College to Plaintiff John E. Langley. Jr.'s First Set of Interrogatories. The other, signed by Sicard on April 4, 2006, was entitled Second Supplemental Answers of Defendant Providence College to Plaintiff John E. Langley, Jr.'s First Set of Interrogatories.
In his April 3, 2006 signed answers, Sicard provided some factual information, but for the most part, Providence College merely interposed more objections to the Plaintiff's interrogatories.
In his April 4, 2006 signed answers, Sicard provided Second Supplemental Answer No. 2. This answer contained a bare bones description of the factual information that "upon information and belief the Defendant believes each individual possesses." (Answer to Interrog. No. 2, April 4, 2006.) Of the eight individuals whose statements and interviews are at issue herein, Sicard's April 4, 2006 supplemental response mentioned only David Petit, David Marshall, Ernest McNair, and Martin Toupin.
Furthermore, the College's April 4, 2006 description of the information known to Petit, Marshall, and McNair was boilerplate and thin. For each, Sicard merely stated:
 "[This individual] has facts and information regarding the incident that occurred on December 13, 2002 because he was one of the many individuals who responded to the scene during the early morning hours of December 13, 2002." (Answer to Interrog. No. 2, April 4, 2006.) *Page 49 
Compared to the contents of the written statements and proffered transcripts, this bare bones description was not only sparse but, especially with respect to McNair, was misleading. Not only did the response fail to give any indication of the actual facts or information any of the three possessed, but it also suggested — as did McNair's written statement that was included in Attorneys Seaver's and Passalacqua's January 14, 2008 submission to this Court — that McNair lacked knowledge or information about any events leading up to the early morning hours of December 13, 2002 when John Langley fell. However, it is apparent from the audio-cassette recordings that McNair, St. Joseph Hall Director and member of the College's Residence Life Central staff, had first-hand knowledge and other information having to do with students' use of the dormitory attic as much as a year earlier — the details of which he communicated in no uncertain terms to Sicard, Dyer, and McGinn during the recorded interview.
Furthermore, it is apparent from the College's proffered transcripts that Marshall and Petit had material information including the identity of other witnesses — such as the security officers who were on the scene the night John Langley died and who may have been in a position to observe its condition and any indicia of use by students. Equally important, if not more so, they had material information about statements against the College's interest made that night, in their presence, by St. Joseph Hall Residential Assistant Edmund St. John and Hall Director Ernest McNair. According to the College's transcript of his interview, Marshall, in particular, could remember exactly what Edmund St. John said and about what he complained. *Page 50 
Providence College's April 4, 2006 signed description of what Martin Toupin knew came in three parts, [15] which were more detailed than the responses having to do with Petit, Marshall, and McNair, but nonetheless were sanitized and highly nuanced. When juxtaposed with the contents of the contested materials, these responses also were misleading and mis-informative. The April 4, 2006 Answer to Interrogatory No. 2 description of what Toupin knew was vague and assigned his knowledge to the fact that he secured the door the morning after Langley's fall; confined his knowledge about previous repairs only to assigned work orders (May 13, 2002; August 19, 2002; and December 12, 2002); and inspected the doorknob and lock on December 12, 2002. However, the College's incomplete transcript of his recorded interview confirmed that he also had additional factual information about repairs made to the lock in previous semesters and extending back at least a year or two. The April 4, 2006 disclosure omitted this important information. Notably, though, in both of the April 4, 2006 signed disclosures relating to Toupin, Sicard set the time of Toupin's December 12, 2002 inspection at approximately 2:15 p.m. (Answer to Interrog. Nos. 2, 9, April 4, 2006.)
The Petit, Marshall, and Toupin disclosures are near perfect examples of Providence College's approach to the discovery in this case. Providence College has not argued that the salient portions of these witnesses' recorded interviews went un-transcribed or were misplaced. Therefore, there could be no excuse for Sicard's failure to *Page 51 
disclose the facts and information in Toupin's possession regarding repairs made to the lock in previous years. Likewise, there could be no excuse for Sicard's failure to disclose the details possessed by him, Petit, and Marshall concerning Edmund St. John's and Ernest McNair's statements made the night Langley fell to his death. However, nowhere in Providence College's nine supplemental interrogatory responses is this information found. Then, later, when Attorneys Seaver and Dyer prepared these witnesses for their depositions, they confined the witnesses' review to Providence College's sanitized and highly selective discovery responses — thus cueing the witnesses to Providence College's version of events, ensuring that any genuine lapses in their memory would remain sleeping, thereby keeping the true facts closeted by their privilege claims.
Moreover, missing from the April 4, 2006 disclosure was a description of the information possessed by Edmund St. John, Michael Frazier, Kevin Hillery, and Sicard himself — personally or in his capacity as the institution's repository of the many facts and information that the contested materials confirm were in his, Dyer's, and McGinn's possession by way of the written witness statements, the College's version of the interview transcripts, and their participation in the witnesses' interviews. Yet, the contested materials make it crystal clear that all four witnesses possessed critical facts and information relevant to the students' use of the attic in previous semesters and years and Providence College's efforts to stop such student use thereof.
Although the witness statements and College's transcripts show that St. John, in particular, possessed direct knowledge and observations concerning the condition of the attic door and of important events taking place in November and December 2002, the only mention of him contained in the April 4, 2006 signed answers was in the context of *Page 52 
College's Second Supplemental Answer for No. 9. This answer, for the most part, was unrelated to St. John except for a brief paragraph. In it, Sicard stated:
 "In November 2002, Resident Assistant Ed St. John noticed that the lock on the doorknob was fully operational. The door was secure (emphasis added.)" (Answer to Interrog. No. 9, April 4, 2006.)
This statement of Sicard's is particularly egregious. In his answer, Sicard failed to disgorge either the information contained in the College's original transcripts or those portions of the recorded interviews that went purportedly un-transcribed. Instead, Sicard selectively set forth information contained in the College's transcript of St. John's interview and followed it with an opinion given by Kevin Hillary, concerning an event taking place on a different date, thus suggesting quite the opposite of what St. John had told his interviewers and grossly distorting the facts and circumstances clearly set out in the transcripts. Sicard's statement wholly ignores the observations St. John made when he investigated the attic in early November of 2002 and inspected the door again on December 12, 2002 at 2:30 p.m.
In its Second Supplemental Answers, Providence College also responded to Interrogatory No. 18 that asked if Providence College had taken statements from Kevin Touhey, the other of the two students the College knew to have been with John Langley the night he fell. In response, the College provided a Super. R. Civ. P. 26(b)(5) privilege log in which it admitted the existence of the communications and written notes; noted that the interview had taken place on December 17, 2002 at 4:15 p.m.; asserted that the notes constituted materials prepared in anticipation of litigation; and contended that the attorney work-product privilege applied. In stark contrast, however, the College failed to *Page 53 
supplement its answer to Interrogatory Nos. 8 or 16 or otherwise disclose the existence of the statements, recordings, and transcripts at issue herein.
Providence College and Sicard responded to the Plaintiff's Third Set of Interrogatories on May 1, 2006, and interposed various objections including an objection aimed at the number of interrogatory questions posed. Sicard also went on to point to his April 4, 2006 signed supplemental response and stated:
 "Furthermore, the Defendant has already provided information to the Plaintiff regarding the knowledge or information that Defendant believes is possessed by each individual identified in Defendant's answers to Interrogatory Nos 1 2, in Defendants' Second Supplemental Answer to Interrogatory #2 of Plaintiff's First Set of Interrogatories." (Answer to Interrog. No. 1, May 1, 2006.)
Sicard further represented:
 "The defendant will continue to supplement its Answer to Plaintiff's Interrogatory No 2 of Plaintiff's First Set of Interrogatories in accordance with the Rules of Civil Procedure, as additional information becomes available through discovery." Id.
With this answer, Providence College avoided the direct question posed in Plaintiff's May 1, 2006 Third Set of Interrogatories, asking for knowledge in the possession of the persons identified in Interrogatory No. 1 of the Plaintiff's January 4, 2006 First Set of Interrogatories, and it confined its response to the persons identified in its responses to Interrogatory No. 2 of the same set of interrogatories. The College also implied that it already had provided the information requested by the Plaintiff's Third Set of Interrogatories — albeit in response to a different interrogatory question, Interrogatory No. 2; intimated that it already had disclosed all relevant evidence in its possession in its previous answer to Interrogatory No. 2; and suggested that it had no other information *Page 54 
available to it except that which might be revealed in the future by the ongoing discovery process.
It was not until August 18, 2006, three and one-half years after the statements and voice recordings were taken, that Providence College filed its Third Supplemental Answer to Plaintiff's First Set of Interrogatories, Interrogatory No. 2 and purported to describe the information possessed by Michael Frazier, Kevin Hillery, Kenneth Sicard, and Edmund St. John.
The August 18, 2006 response having to do with St. John stated:
 "Ed St. John has facts and information regarding the events in the dorm leading up to the incident. He also has facts and information regarding the events immediately following the incident because he was one of the first people who responded to the scene. Mr. St. John was a resident assistant on the 4th floor of St Joseph Hall at the time of the incident.
 Mr. St. John has facts and information regarding a group of students that included John Langley whom he caught smoking marijuana in the dorm on Sunday evening December 1, 2002.
 Mr. St. John has facts and information regarding being awoken during the early morning hours of December 13, 2002 by a knock on his door and being informed that someone had fallen out of a window. He has facts and information regarding looking out a window, calling security from another RA's cell phone, and running downstairs and outside. He has facts and information regarding being the first person to respond to the scene, after Kevin Touhey, and finding Kevin Touhey holding John D. Langley. He has facts and information regarding taking off his fleece jacket to cover John to try to keep him warm.
 Mr. St. John has facts and information regarding attending a memorial mass/service held by Providence College about 1-2 months after John passed away." (Answer to Interrog. No. 2, August 18, 2006.) *Page 55 
The August 18, 2006 St. John disclosure, disjointed and full of seemingly innocuous detail, stands in chilling contrast to the detail contained in the contested materials including the College's own version of the transcripts. Furthermore, it is another near perfect example of the pattern revealed by Providence College's discovery disclosures. One would not suspect from the first sentence of this answer and the ensuing detail concerning more inconsequential matters that on December 12, 2002, at approximately 2:30 p.m., shortly after Martin Toupin had attended to the attic door, St. John also inspected the door, observed that the hasp and plate were loosen from the wall and, thereafter, reported the matter to Kevin Hillery. However, the College's own version of the transcripts confirms that he did. Equally as importantly, the disclosure also omits the observations St. John made upon investigating the attic in early November 2002 when he and Kevin Hillery realized that the door and frame were damaged and that the door would pop open when pulled — even when the lock on the doorknob was engaged. These observations were contained in the College's transcripts but only obliquely alluded to in Sicard's April 4, 2006 Second Supplemental Answer to Plaintiff's Interrogatory No. 9 concerning St. John. Finally, the disclosure omits any reference to St. John's statements made to campus security officers and the College officials with whom St. John spoke shortly after John Langley fell — the former of which were referenced in the College's original interview transcriptions and the latter in the audio-cassette recordings.
When compared with the contents of the contested materials, including the College's original transcripts, the St. John disclosure is not merely sanitized; it misleads the reader and conceals the truth about what St. John knew about students' use of the attic and what he did about that. Furthermore, the juxtaposition of information and details *Page 56 
against a seeming lack of information and details would lull any reasonable person into believing that St. John possessed facts of little relevance beyond what happened after Langley fell. However, the contested materials confirm that he was in possession of far more information than that. Providence College's disclosure, a sanitized version of what St. John knew but replete with detail about less consequential matters, leads the reader away from St. John and what he actually knew, said, and did — as opposed to setting forth his knowledge in a way that would cause the reader to think there was something sufficiently material to be discovered or given priority in follow up.
Notably, too, the contested materials contain no mention whatsoever of St. John having caught students, much less John Langley, smoking marijuana on December 1, 2002. Yet when it came to disclosing St. John's knowledge about events prior to Langley's death — information which, if not exactly exculpatory, certainly would suggest that any information St. John possessed would be of little of help to the Plaintiff — the College obviously turned to some other source of information while conveniently ignoring the highly relevant but damaging facts contained in the witness statements, original transcripts, and audio-cassette recordings.
Furthermore, in contrast to the St. John disclosure and appearing just paragraphs later, in Providence College's same set of supplemental answers having to do with another witness, Sicard answered:
 "Mr. Kevin Montiero has facts and information regarding the events leading up to the incident that occurred on December 13, 2002 as well as facts and information regarding the incident because he was one of the many individuals who responded to the scene of the incident. Mr. Montiero was a Resident Assistant on the 4th floor of St Joseph Hall at the time of the incident. Upon information and belief, Mr. Montiero had lived in St. Joseph Hall for *Page 57 
approximately two and one-half (2½) years prior to the date of the incident and never had any knowledge of students accessing or attempting to access the attic or the roof of St. Joseph Hall prior to the incident." (Answer to Interrog. No. 2, August 18, 2006.)
The Montiero answer, as did other exculpatory answers and information threaded throughout Providence College's discovery responses, suggested that the College's institutional memory had been fully searched and that even the most vague and unsubstantiated second-hand information was being produced to the Plaintiff — once again potentially lulling the reader into thinking there were better things to follow up on than any one of these witnesses.
The August 18, 2006 disclosure pertaining to Michael V. Frazier was more complete than that given for Marshall, Petit, and McNair on April 4, 2006, but it omitted important facts. For example, although implicitly acknowledging the relevance of Frazier's observations made about the condition of the attic when he viewed it at approximately 9:00 a.m. on December 13, 2002, Sicard's answer omitted information contained in Frazier's statement of December 13, 2002, whereby Frazier identified the other individuals, including Sicard and Vice President of Finance and Business and Chief Financial Officer Warren Gray, who also were present in St. Joseph Hall during the morning after Langley died. Like Frazier, these individuals may have been in the unique position of being able to observe the condition of the attic or any indicia that students had been accessing or occupying it in the past. The answer also omitted any reference to statements made by Sicard himself, in Frazier's presence, concerning students accessing the attic in the past. *Page 58 
The August 18, 2006 disclosure pertaining to Kevin Hillery was similarly misleading and deficient. Sicard stated:
 "Mr. Kevin Hillery has facts and information regarding the events leading up to the incident due to the fact that he was Assistant Director of Residence Life at the time of the incident. Mr. Hillery has facts and information regarding a work order he requested on August 19, 2002 — Work Order No. 16699. Mr. Hillery also has facts and information regarding a work order that he called in with RA Ed St. John in November 2002. Mr. Hillery has facts and information regarding the quality of work with respect to the hasp and lock on the attic door and that he and RA Ed St. John noticed on November 25, 2002. Mr. Hillery has facts and information regarding his verbal request to the Physical Plant Department to replace said hasp and lock on November 26, 2002 after he learned that the system had not taken his work order from the previous day. Mr. Hillery has facts and information regarding meeting with Locksmith Marty Toupin during the morning of December 12, 2002. Mr. Hillery has facts and information regarding Work Order No. 23362, dated December 12, 2002, as well." (Answer to Interrog. No. 2, August 18, 2006.)
Omitted from the disclosure were Hillery's knowledge about repairs made to the doorknob and lock in years past; a written work order prior to August 19, 2002; the observations he made in May 2002 that led him to think that students could access the attic; the observations he made when he and Edmund St. John inspected the attic door in early November 2002 and found the door to be permanently damaged; his knowledge about the College's practices concerning verbal work orders; his knowledge about technical computer problems the College was experiencing in November and December 2002; the specific observations he made when he inspected the attic door on November 25, 2002; his verbal instructions given to Martin Toupin early in the day on December 12, 2002; and his recollection about having seen Edmund St. John thereafter — all of which are contained in his written statement or the College's version of the transcripts. *Page 59 
Also missing was any account of what he noted about the attic on the morning of December 13, 2002, facts about which were contained in the audio-cassette recordings. As with the other disclosures, selective portions of the response are vague and mostly state the nature of Hillery's information as opposed to providing the specifics about the actual facts and information that Sicard and the College knew to be in his possession.
With respect to the August 18, 2006 disclosure about himself, Sicard stated on behalf of the College:
 "FR. Sicard has facts and information regarding the early morning hours of December 13, 2002 because he went to Rhode Island Hospital to be with the Langley family and with numerous Providence College students during this time." (Answer to Interrog. No. 2, August 18, 2006.)
As to objections, Providence College stated:
 "It is the Defendant Providence College's position that some of the conversations between Fr. Sicard and the Langley family, students, and other individuals that may have taken place subsequent to the incident are protected by the Priest-Penitent Privilege." Id.
With this answer, Providence College and Sicard concealed the mother lode of facts and information, memorialized by the contested materials, that were possessed by him as a repository of Providence College's institutional memory and the College's representative designated to answer the Plaintiff's interrogatories under oath. Sicard's answer also concealed the fact that he, too, had conversations with Edmund St. John on the night of John Langley's death, and swept under the rug facts and information having to do with where he was and what he said the morning after. As to the priest-penitent privilege objection, Providence College failed to present any manner of privilege log that would enable the Plaintiff, and the Court, to make a meaningful determination about whether or *Page 60 
not the privilege applied to the statements made by any one of these unidentified individuals.
Providence College filed its Fourth Supplemental Answers to Plaintiff's First Set of Interrogatories nearly a year later on July 13, 2007. The answers did not yield further facts or information memorialized in the contested materials.
On August 7, 2007, Providence College filed its Fifth Supplemental Answer to Plaintiff's First Set of Interrogatories. In it was the College's first supplemental answer to Interrogatory No. 16. For the first time, the College admitted it had investigated Langley's death and, pursuant to Super. R. Civ. P. 26(b)(5), disclosed the existence of the statements, reports, recorded interviews, and interview notes, after asserting the attorney-client communications and work-product based privileges with respect to all of them. In addition, the College speciously asserted the priest-penitent privilege over two of the contested documents: Kevin Hillery's memorandum regarding the maintenance of the attic door and the transcription of Dyer's meeting with Sicard.[16]
On Sept 20, 2007, in Providence College's Sixth Supplemental Answers of Defendant Providence College to Plaintiff John E. Langley, Jr.'s First Set of Interrogatories, Sicard provided a supplemental answer to Interrogatory No. 13, which had asked a year and one-half earlier on January 4, 2006:
 "When did Providence College first obtain information (including secondhand or hearsay information) that students were able to enter the attic or the cupola, or climb onto the roof of St. Joseph Hall? Describe such information, the source of the information, and all documents referring to such information." *Page 61 
Limiting his answer to individuals who attempted to access only theroof and pointing to what had been revealed in the deposition testimony only, Sicard stated:
 "The first time that Providence College learned that students had attempted to, could, and did access the roof of St. Joseph Hall, was after the Incident of December 13, 2002.
 "The deposition testimony thus far and Providence College Physical Plant work orders already produced in the course of this litigation illustrate that certain individuals employed by Providence College were aware that someone tampered with and vandalized the door and doorknob lock to the attic of St. Joseph Hall. Providence College employees repaired the vandalism to the attic door and door knob lock on each of those occasions. Providence College is not aware of any employee, present or former, who had knowledge of any individual, including but not limited to students, who attempted to access the roof or had gone out onto the roof of St. Joseph Hall, for non-work related purposes, prior to the incident of December 13, 2002." (Answer to Interrog. No. 13, September 20, 2007.)
With this careful wordsmithing, Sicard changed his previous response to Interrogatory No. 13 — a response with which he already had re-cast the Plaintiff's original question and then had replied falsely. And where he previously denied Providence College had prior knowledge that "students were entering the attic, or cupola, or climbing onto the roof" (emphasis added), his supplemental response was now confined to students who "had attempted to, could, and did access the roof" (emphasis added). Then, when referring to employees having prior knowledge of students attempting to access or going out onto the roof, Sicard limited his answer to knowledge of any specific individual. Finally, Sicard confined his answer to information contained in the deposition testimony — testimony that is only as good as the deponent's memory and candor — instead of acknowledging the facts and information in the College's possession and *Page 62 
imputed to it. The upshot was that Sicard again avoided admitting the highly damaging facts and information in his and Providence College's possession and memorialized in the contested materials.
At the same time, Providence College also provided its Supplemental Answer No. 15. In it, Sicard stated:
 "Providence College maintains its answer that it first became aware that students entered the attic and climbed out onto the roof of St. Joseph Hall after the Incident of December 13, 2002. The Defendant is aware that former Providence College students have testified at their depositions that they either: (1) attempted to access the attic; (2) did access the attic; or (3) went out onto the roof of St. Joseph Hall through the cupola in the attic. The Defendant refers the Plaintiff to the transcripts of these depositions. The Defendant maintains it was not aware that these students had entered the attic or cupola, or had climbed out onto the roof of St. Joseph Hall at any time prior to the Incident of December 13, 2002. The Defendant refers the Plaintiff to its Supplemental Answers to Plaintiff's Interrogatory No. 2." (Answer to Interrog. No. 15, September 20, 2007.)
With another display of exceptional sleight-of-hand, Sicard switched his original answer having to do with students, in addition to John Langley, who Providence College knew "were entering the attic or cupola, or
climbing onto the roof" (emphasis added), and confined his answer to students who "entered the attic and climbed out onto the roof" (emphasis added). Then, when presently referring to students who had "entered the attic or cupola, or had climbed out onto the roof" (emphasis added), Sicard confined his answer to those particular students identified in the deposition transcripts. By twice recasting the Plaintiff's interrogatory question and limiting his answer, Sicard continued to avoid giving a straight answer to the question and having to disgorge facts and information memorialized in the contested materials. *Page 63 
Providence College filed its seventh and eight supplemental answers to Plaintiff's First Set of Interrogatories on October 24, 2007 and December 6, 2007, respectively. It supplemented its answer to Interrogatory No. 2 but failed to include the missing facts, information, or hearsay knowledge known to the eight individuals whose statements and interviews are at issue herein.
On January 9, 2008, the day before the first hearing on the instant motion, Providence College filed its Ninth Supplemental Answers to Plaintiff's First Set of Interrogatories (Ninth Supplemental Answers) in which it supplemented its disclosure of the knowledge and information possessed by security officers David Marshall and David Petit.[17] The supplemented disclosure having to do with Marshall was bereft of any reference to Edmund St. John or to the statements, memorialized in the College's original transcripts, St. John made to Marshall and which had to do with complaints St. John made to Kevin Hillery about the security of the attic door, and the College's failure to do anything about those complaints. Similarly, the supplemental disclosure pertaining to Petit was bereft of any reference to similar statements that both St. John and Ernest McNair made to him — statements which demonstrated that the two of them possessed specific knowledge concerning students' previous use of the attic and the College's attempts to foil it.
In its Ninth Supplemental Answers, Providence College for the first time revealed that two of its security officers, John Dunbar and David O'Connor (O'Connor), had been dispatched to the attic immediately after John Langley's fall and therefore may have been in a position to verify its condition, observe any indicia of students accessing the attic in *Page 64 
the past, hear statements made by Edmund St. John and other witnesses, or reveal information concerning the third student who was with John Langley that evening before he fell. This information about Dunbar and O'Connor, the latter of whom was listed in the Ninth Supplemental Answers as a "new" witness, was contained in the College's original transcripts.
At no time did Providence College and Sicard further supplement their April 4, 2006 disclosure about Ernest McNair in which Sicard so misleadingly stated:
 "Ernest McNair has facts and information regarding the incident that occurred on December 13, 2002 because he was one of the many individuals who responded to the scene during the early morning hours of December 13, 2002." (Answer to Interrog. No. 2, April 4, 2006.)
Instead, on November 7, 2008, Providence College's attorneys withdrew their privilege-based objection to producing McNair's written statement — the statement they eventually would come to include in their January 14, 2008 submission to the Court, offering it in connection with Tape #1.
McNair's written statement was brief and matched the April 4, 2006 disclosure which suggested he had knowledge of subsequent events only. Ultimately, when provided to the Court in Seaver and Passalacqua's January 14, 2008 submission, the statement would help mask the fact that crucial information concerning prior events might be missing from the College's Tape #1 transcription in particular and that statements attributable to McNair were contained therein. The statement contained only McNair's description of the events taking place on the night of December 13, 2002 when John Langley fell to his death. It read: *Page 65 
 "December 13, 2002
 At approximately 2:30 am Friday morning, I was awakened by a loud noise. The noise was coming from outside in between Res Life and Accino. I ran out side to meet R.A. Ed St. John. As I came outside EMT's were arriving on the scene. I came to find John Langley semi-conscious on the floor. I stood there as EMT's picked up John Langey's body on the stretcher and transported him to the hospital. As the EMT's were leaving, Kenne Williams arrived on the scene. Kenne Williams is John Langley's immediate roommate. He was upset and I took time to try and calm him down. I asked him who had John been with that night and he told me that he was with Kevin Toohey and his roommate out drinking alcohol. I asked him to come with me to find Matt Toughey. We found Matt Toughey on the fourth floor hysterical and screaming. After a few questions, I found out that Matt was on the roof with John when everything happened. I took Matt to security and the Providence Police and they began to question him. Matt was very upset, so I requested that someone would come and talk to him. I sent Pat Felix to wake Fr. Eri up and have him come talk to Matt. Fr. Eri came and spoke to Matt. Matt Toughey went to Rhode Island Hospital where John Langley was. I then escorted Ed to the chapel to pray. On the way back we were met by John Hogan who spoke with Ed to make sure that he was ok.
 Sincerely,
 /s/ Ernest McNair"
(McNair Statement, dated December 13, 2002.)
 III Providence College Provides its Tenth Supplemental Answers to Plaintiff's First Set of Interrogatories
On March 3, 2009, as this Decision was nearing completion, Providence College provided its Tenth Supplemental Answers of Defendant Providence College to Plaintiff John E. Langley, Jr.'s First Set of Interrogatories (Tenth Supplemental Answers). *Page 66 
Providence College's Tenth Supplemental Answers came approximately three years after the Plaintiff propounded his interrogatory requests, nearly a year after the College had first been called to task by the Court concerning the disparity between the contents of its interview transcripts and its discovery responses, and long after its attorneys admitted to having listened to the audio-cassette recordings for clarity's sake.[18]
In its Tenth Supplemental Answers, Providence College acknowledged a multitude of factual details and information memorialized in the contested materials but not previously disclosed in the College's serial responses to the Plaintiff's interrogatory questions. When taken together with the witness statements and recorded interviews, the information helped crystallize — for the Court at least — the colloid of facts surrounding John Langley's death and the evidence supporting the elements of the Plaintiff's claims, including foreseeability, notice, a defect, knowledge of the defect, failure to act, and causation, along with evidence of subsequent remedial measures. Nonetheless, Providence College continued to hold back discoverable information from the Plaintiff.
Providence College's newly proffered discovery responses were signed by Providence College Vice President for Academic Affairs Hugh Lema (Lema) with Providence College legal secretary Mary Caprio, notarizing his signature. In his Answers, Lema provided Supplemental Answer No. 2 for eleven of the witnesses whom Dyer is known to have interviewed more than seven years earlier, including eight whose statements and recorded interviews are the object of the instant motion. Supplemented were the College's answers with respect to John Dunbar, Michael Frazier, Kevin Hillery, David Marshall, Joseph McDonald, Ernest McNair, David Petit, Carl Russo, Fr. Sicard, Edmund St. John, and Martin Toupin. *Page 67 
In spite of their improved content, Lema's Tenth Supplemental Answers were nuanced and omitted important details — like Sicard's previous answers. In addition and more so than Providence College's earlier disclosures that were considerably briefer, these answers were structured in run-on sentences and garbled phrases that often muddied their meaning and content and rendered them near useless for purposes of impeachment, as statements against interest or as admissions, or other attribution. Finally, as with the College's previous answers, its Tenth Supplemental Answers elaborated on exculpatory information while responding sparsely when it came to damaging information, thus limiting their utility for refreshing any recollections other than those favorable to the College.
For example, although the lengthy disclosure for John Dunbar for the first time[19] acknowledged the fact that Edmund St. John made certain statements to him the night of John Langley's death, the disclosure did not admit what he heard St. John say or otherwise specify the substance of St. John's statements. Conversely, the same disclosure is replete with details of conversations and direct quotes, including expletives, from other witnesses whose quoted statements are of little consequence. The Dunbar disclosure goes on at length with information favorable to Providence College and particularizes student Kevin Touhey's reaction to the incident, describing his conduct and countenance in unflattering detail, and purporting to quote him directly. On the other hand, when disclosing the fact that Edmund St. John also made statements in Dunbar's presence, the College stated only: *Page 68 
 "Officer Dunbar is anticipated to have information concerning Ed St. John's comment to him that night that there had been a problem with the attic door." (Answer to Interrog. No. 2, March 3, 2009.)
Notably, with respect to David Petit, Lema assigned to him knowledge of facts and information that were not found in the contested materials and, further, information about which his deposition testimony indicated he had no recollection. With respect to David Petit, the disclosure stated in part:
 ". . . RA St. John telling him that students had been up there before — to the attic — that there was a lock there and the students had broken it in the past and they'd broken the lock off the door, and that he informed Residence Life about the lock either a day or a couple of days prior to the accident; and may have information concerning Hall Director Ernest McNair telling Officer Petit that he also knew that RA St. John had talked to someone from Residence Life about the broken lock (at his deposition, he did not recall speaking with Ernest McNair)." (Answer to Interrog. No. 2, March 3, 2009.)
Thus although Petit stated during his deposition that he had no recollection of these matters, the College's muddy interrogatory answer nonetheless suggested that students only lately broke the doorknob off the door and, further, that St. John and McNair only recently had reported that to Residential Life. Yet the contested materials confirm that it was McNair who, in previous semesters, observed the doorknob and lock to be missing from the door; that St. John was aware that the existing doorknob lock was ineffective; and, further, that St. John's report to Kevin Hillery of several hours earlier had to do with the hasp and padlock, not the doorknob lock. Upon confusing these events, Lema went on to remind, "at his deposition [Petit] did not recall speaking with Ernest McNair[]" (Answer to Interrog. No. 2, March 3, 2009.) *Page 69 
With respect to David Marshall, the disclosure stated:
 "Sgt. Marshall may also have information about being informed by RA Ed St. John at the scene of the accident that students may have accessed the attic, that he (St. John) had informed Kevin Hillery on December 12, 2002, that the door needed to be secured, and that the (St. John) believed nothing had been done (since telling Kevin Hillery on the afternoon of December 12, 2002) [.]" (Answer to Interrog. No. 2, March 3, 2009.)
Similar to the Petit disclosure, the disclosure for David Marshall provided detail about Edmund St. John's statements that are not found in the Marshall's recorded statement, blends the events leading up to John Langley's death, and suggested that St. John only recently discovered and reported the problem. Lema's Tenth Supplemental Answer also goes on to remind that "Sgt. Marshall may also have information about having no recollection of a conversation with RA St. John the night of the accident, as indicated in his deposition transcript." (Answer to Interrog. No. 2, March 3, 2009.)
Providence College's Tenth Supplemental Answer with respect to Edmund St. John finally came close to the truth but, again, left out important information contained in the voice recordings. In his answer, Lema stated:
 "RA St. John is anticipated to have information concerning possible tampering with a magnetic door lock on the fourth floor hallway; possible tampering with the attic door, which he discovered during rounds early in November of 2002, in that, although the doorknob lock appeared to function correctly (the doorknob did not turn; it responded as if it was locked), it could be opened with a hard yank; his observations of beer cans, signs, cigarette butts and graffiti on the wall that said "02 in the attic; and his observation at approximately 2:30 p.m. on December 12, 2002, that apparently one or more screws were missing from the hasp and lock on the attic door, and as a result, the hasp and lock could be pulled out of the wall were someone to pull it." (Answer to Interrog. No. 2, March 3, 2009.) *Page 70 
He further stated:
 "RA St. John is anticipated to have information about informing Kevin Hillery early in November of 2002 of the possible tampering with the attic door; about the placement of a work order; about entering information in the work order log/journal that was kept in the staff office in St. Joseph Hall; about checking the attic door during his duty rounds, per Mr. Hillery's instructions; and about noticing a hasp and lock with a small padlock on the attic door a few days later (installed, he believed, by Physical Plant), and feeling confident that the door was secure." Id.
Notably, although the College's latest disclosure stated that at 2:30 p.m. on December 12, 2002, St. John observed that "one or more screws" had been removed from the metal plate that secured the hasp device to the wall, id., it failed to disclose that the actual number of missing screws was three and, further, that it was St. John himself who pulled the plate and remaining screw from the wall such that the only device left securing the door was the doorknob and that lock — which the College already knew was ineffective. Additionally, although Lema also finally admitted that St. John had discovered graffiti in the attic indicating that students had been there in "`02," id., Lema failed to disclose that the graffiti also included the words indicating "John was here" and "We got into the attic in `02." Although at first blush such a detail seems innocuous, it takes on a larger meaning when viewed in light of the College's February 13, 2006 answer to Interrogatory No. 3, which reveals that, other than John Langley, only four students named John lived in St. Joseph's Hall during the fall semester of 2002 and of them, it was only Langley who lived on the fourth floor where the stairs to the attic door were located. Further, Lema's statement that St. John was "feeling confident that the door was secure" helps to reconcile Sicard's April 4, 2006 Second Supplemental Answer pertaining to Interrogatory No. 9 in which Sicard so misleadingly stated: *Page 71 
 "In November 2002, Resident Assistant Ed St. John noticed that the lock on the doorknob was fully operational. The door was secure (emphasis added)." (Answer to Interrog. No. 9, April 4, 2006.)
However, the answer omits St. John's observations made shortly thereafter when he inspected the door with Kevin Hillery, and they saw that the padlock's hasp device was badly installed and easily could be removed from the wall. Furthermore, although Lema described St. John's confidence that the door was secure, he failed to describe St. John's fear, as articulated in his recorded interview, that students could be injured if they gained access to the attic.
For Martin Toupin's disclosure, the College and Lema admitted for the first time in their Answers that Toupin replaced or repaired the doorknob lock on the attic door two or three times during the several years previous to John Langley's death and, further, that he suspected that students had jimmied the door with some type of tool — information also memorialized in the College's transcription of Toupin's interview but which was not set forth in its previous answers to the Plaintiff's interrogatories. Just as importantly, Providence College for the first time acknowledged that on December 12, 2002, Martin Toupin failed to install a new hasp and padlock on the attic door as he had been instructed to do by Kevin Hillery and, instead, merely tightened the existing door knob and lock. Notably, however, Lema's response changed the timing of Toupin's activities from 2:15 p.m. — as was twice indicated in Sicard's April 4, 2006 Second Supplemental Answers — to "2:15 to 2:30 p.m.," (Answer to Interrog. No. 2, March 3, 2009), thus leaving room for an argument to be made that Toupin attended to the door after St. John pulled the hasp from the wall. *Page 72 
With respect to the McNair disclosure, Providence College finally acknowledged that Ernest McNair and Kevin Hillary observed lawn chairs, beer cans, and other indicia of students' use of the attic during the prior academic year. However, the answer failed to disclose both his observations made in a previous semester that the door handle had been missing altogether and the information that he may have first heard about students accessing the attic from campus security. The answer also failed to disclose McNair's reason for not having followed up on the matter until Edmund St. John mentioned his own findings to McNair in early November 2002, and then took no action other than to advise St. John to report the matter to Kevin Hillery.
With respect to Carl Russo, for the first time, [20] Providence College confirmed in its interrogatory answers that he had discovered a 10-speed bicycle stored in the attic on December 4, 2002 and that he spoke to Kevin Hillery shortly thereafter. The answer also provided over a page of single-spaced, typed detail about Russo's activities in and about the attic during March, August, and September 2002. However, when it came to the point *Page 73 
of detailing his observations concerning the condition of the attic during those times, the College stated only:
 "Mr. Russo is anticipated to have information concerning the condition of the attic and the cupola on March 27, 2002, the condition of the door to the attic and the attic on August 15, 2002 and August 29, 2002, and the condition of the door to the attic, the attic, and the cupola in September of 2002 and on December 4, 2002." (Answer to Interrog. No. 2, March 3, 2009.)
As with the Dunbar disclosure and similar to the April 4, 2006 initial disclosures for Marshall and Petit, the interrogatory answer having to do with Carl Russo was bound not to spark any lapsed memories and, further, left the Plaintiff with little of substance that could be attributed to the College.
With respect to Michael V. Frazier's disclosure, Providence College for the first time acknowledged, as memorialized in Frazier's written statement of over seven years earlier, that Fr. Sicard was present in St. Joseph's Hall the morning after John Langley fell and made statements concerning students' use of the attic in the past. Yet the disclosure omits the substance of those statements.
With respect to Kevin Hillery, Providence College and Lema revealed much but not all of the truth about the events of May, November, and December 2002. As with the College's previous Answers, the Hillery disclosure frequently stated the nature of Hillery's knowledge as opposed to the substance of it. In this disclosure Lema and Providence College included irrelevant details not included in the contested materials but which, for some, might portray John Langley in a bad light and thus deter further inquiry. Importantly and as with the College's previous answers concerning Hillery, Lema and the College finessed the highly pertinent details concerning Hillery's November 2002 *Page 74 
observations that the door or frame had been permanently damaged and the door could be popped opened even when the lock in the doorknob was operational. Likewise, it obscured the reason that Hillery ordered a new padlock and hasp for the door; that is, the existing device had been installed such that the screws were accessible, thus rendering that device ineffective as well — regardless of how strong of a new padlock was used with it.
Moreover, Lema failed to disclose the following, either with respect to Hillery or St. John. After Edmund St. John made his discovery at 2:30 p.m. on December 12, 2002 and thereafter reported to Kevin Hillery that the door had not been secured, Hillery failed to follow up or to discover that Martin Toupin had not completed the work order Hillery had given him earlier in the day. More specifically, Lema failed to disclose that when St. John brought the matter to Hillery's attention at the close of the day on December 12, 2002, Hillery was embroiled in the chaos of the Residential Life offices' Christmas party, was on his way to another College Christmas party at Fr. Smith's, and was frantically getting his things together to leave for that party.
With respect to Fr. Sicard, Lema revealed considerable detail about the events taking place at the hospital after John Langley had been transported there. However, Lema failed to disgorge the important details having to do with the conduct and statements of the College's officials and employees — all of which were in Sicard's possession as repository of the College's institutional memory and all of which could be attributed to the College. Furthermore, Lema equivocated about other facts and information newly revealed to be in its Vice President's possession by stating,
 "Upon information and belief, Fr. Sicard may possess the following information: . . . Information concerning the *Page 75 
issue of student access to prohibited areas and the College's response, and his lack of awareness that students had accessed the attic of roof of St. Joseph Hall prior to John Langley's accident." (Answer to Interrog. No. 2, March 3, 2009.)
Thus although Providence College alluded to having known that students would attempt to access prohibited areas and, further, that it had taken action on that knowledge, the College did so only "upon information and belief" and without admitting any of the details. Lema also failed to reveal that Sicard had conversations with Edmund St. John shortly after John Langley fell and, further, failed to reveal the content of St. John's statements. So, too, Lema failed to acknowledge Sicard's statements, made in front of Michael Frazier the morning of December 13, 2002, in which Sicard stated that students had been accessing the attic. Nor did Lema describe the information Sicard possessed or the source of that information. Finally, Lema failed to disclose that Sicard had been present, shortly after John Langley fell, when student Kevin Touhey gave his account of what had taken place that night and, further, what Touhey had stated.
Providence College's Tenth Supplemental Answers also included other first time revelations. For example, revealed for the first time was Vice President of Finance and Business and Chief Financial Officer Warren Gray's presence at the scene of the attic during the early morning hours of December 13, 2002 — information memorialized more than seven years earlier in Frazier's written statement. So, too, it was acknowledged for the first time that Edmund St. John also made statements to security officer Joseph McDonald on the night John Langley fell. Interestingly, too, the Tenth Supplemental Answers corrected Providence College's insurance information provided in its February 13, 2006 Answer to Interrogatory No. 24. The College again confirmed that it had *Page 76 
primary coverage in the amount of $1,000,000 but, also, that each of its two excess policies was for $25,000,000 — not $25,000 as previously indicated.
Providence College did not supplement its April 4, 2006 Answer to Interrogatory No. 26 in which it stated:
 "In support of its First Affirmative Defense the Defendant Providence College states that it was not aware, prior to the Incident of December 13, 2002, that any students were accessing the attic or roof of St. Joseph's Hall. Providence College states that the lock on the doorknob to the attic was fully operational throughout the Fall 2002 Semester up through at least 2:15 p.m. on December 12, 2002." (Answer to Interrog. No. 26, April 4, 2006.)
 IV The Attorney Client and Work-product Privileges A Attorney-Client Communications
Throughout the proceedings on the instant motion, it has been the Plaintiff's contention that the attorney-client communications privilege does not apply because the staff members who participated in the recorded discussions were not part of a control group authorized to speak or act on behalf of the College. Providence College, on the other hand, urges the Court not to apply the requirements of the control group test, so-called, and, instead, extend the attorney-communications privilege to the communications memorialized in the recorded interviews and written statements.
Before turning to the question of control group as a factor in determining the applicability of the attorney-client communications privilege, a general discussion of that privilege is warranted. Although under the Superior Court Rules of Civil Procedure, the provisions "pertaining to discovery generally are liberal, and are designed to promote *Page 77 
broad discovery among parties during the pretrial phase of litigation,"Henderson v. Newport County Regional Young Men's Christian Ass'n,966 A.2d 1242, 1246 (R.I. 2009), it is undeniable that privilege-protected data generally is not discoverable notwithstanding the philosophy underlying modern discovery. Id.
It is axiomatic that "communications by a client to his attorney for the purpose of seeking professional advice, as well as the responses made by the attorney to such inquiries, are privileged communications not subject to disclosure." State v. Grayhurst, 852 A.2d 491, 512 (R.I. 2004) (quoting Mortgage Guarantee Title Co. v. Cunha, 745 A.2d 156, 158-59
(R.I. 2000)). However, "[t]he mere existence of a relationship between attorney and client does not raise a presumption of confidentiality,"Pastore v. Samson, 900 A.2d 1067, 1084 (R.I. 2006), and plainly, not all communications between attorneys and their clients enjoy the privilege.See e.g., In re Public Defender Service, 831 A.2d 890, 901 (D.C. 2003) (quoting United States v. Zolin, 491 U.S. 554, 563 (1989)) (observing that the crime-fraud exception "`assure[s] that the seal of secrecy between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime[]'"). Therefore, "the recognition of a privilege based on a confidential relationship . . . should be determined on a case-by-case basis." UpjohnCo. v United States, 449 U.S. 383, 396 (1981).
It also must be remembered, that "privileges, in general, are not favored in the law and therefore should be strictly construed." Gaumondv. Trinity Repertory Co., 909 A.2d 512, 516 (2006) (quoting Moretti v.Lowe, 592 A.2d 855, 857 (R.I. 1991)); see also Pastore, 900 A.2d at 1084
(holding "that the attorney-client privilege must be narrowly construed because it limits the full disclosure of the truth"); State v. von Bulow, *Page 78 475 A.2d 995, 1006 (R.I. 1984) ("Because the attorney-client privilege limits the full disclosure of the truth, it must be narrowly construed."). The reason for such narrow construction is "that the primary function of the judicial process indisputably is truth-seeking . . . [and] privileges do not aid the quest for truth, the core function of the adversary process[.]" Gaumond, 909 A.2d at 516-17 (quoting Pastore,900 A.2d at 1086).
Just as importantly, even where the attorney-client privilege does apply, it "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney. . . ." Upjohn, 449 U.S. at 395. In Upjohn Co., the United States Supreme Court succinctly pointed out that
 "[t]he protection of the privilege extends only to communications and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, `What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." Id. at 395-96 (quoting City of Philadelphia v. Westinghouse, 205 F.Supp. 830, 831) (D.C.Pa. 1962)) (emphasis in the original).
Accordingly, "the courts have noted that a party cannot conceal a fact merely by revealing it to his lawyer[.]" Id. at 396 (quoting State exrel. Dudek v. Circuit Court, 34 Wis.2d 559, 580, 150 N.W.2d 387, 399
(1967)). It also is well established that "[a] party may not hide behind confidentiality to avoid disclosure of unfavorable evidence." Gaumond,909 A.2d at 517 (citing State v. Guido, 698 A.2d 729, 734 (R.I. 1997)).
Therefore, "[t]he critical inquiry is whether, viewing the lawyer's communication in its full content and context, it was made in order to render legal advice or services to *Page 79 
the client." Id. Indeed, the elements that must be established in order to invoke the attorney-client privilege consist of the following:
 "`(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.'" von Bulow, 475 A.2d at 1004-1005 (quoting United States v. Kelly, 569 F.2d 928, 938 (5th Cir.), cert. denied, 439 U.S. 829
(1978)). (Emphases added.)
It is axiomatic that "[t]he burden of establishing the existence of the attorney-client privilege rests on the party seeking to prevent disclosure of protected information." Rosati v. Kuzman, 660 A.2d 263, 265
(R.I. 1995) (citing von Bulow, 475 A.2d at 1005); see also Gaumond,909 A.2d at 517 (stating that "[t]he burden of establishing entitlement to nondisclosure rests on the party resisting discovery").
In determining the applicability of the attorney-client privilege in the corporate context, courts have considered and applied a control-group test, so-called, as an additional factor in determining whether the attorney-client privilege ought to be extended to certain communications between the attorney and the corporate client's employees. Pursuant to this test, communications to a corporation's attorney are considered privileged only "if the employee making the communication, of whatever rank he [or she] may be, is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the *Page 80 
attorney, or if he [or she] is an authorized member of a body or group which has that authority. . . ." City of Philadelphia v. WestinghouseElectric Corp., 210 F.Supp. 483, 485 (E.D.Pa. 1962). As the Supreme Court of Illinois stated in Consolidation Coal Co. v. Bucyrus-ErieCo., the control group includes top management as well as "an employee whose advisory role to top management in a particular area is such that a decision would not normally be made without his [or her] advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority. . . ." Consolidation Coal Co. v.Bucyrus-Erie Co., 432 N.E.2d 250, 258 (Ill. 1982). That court also clarified that "the individuals upon whom [a member of the control group] may rely for supplying information are not members of the control group." Id.
However, courts have declined to apply control group limitations under certain circumstances, recognizing that the control group test can "frustrate the very purpose of the privilege by discouraging the communication of relevant information by employees of the client corporation" and finding that "the attorney's advice will also frequently be more significant to non-control group members than to those who officially sanction the advice, and the control group test makes it more difficult to convey full and frank legal advice to the employees who will put into effect the client corporation's policy." Upjohn Co.,449 U.S. at 384. As pointed out by the United States Supreme Court,
 "Middle-level-and indeed lower-level-employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he [or she] is adequately to advise the client with respect to such actual or potential difficulties." Id. *Page 81 
In instances where they have refused to apply the control group test, courts have held that the control group test "not only makes it difficult for corporate attorneys to formulate sound advice when their client is faced with a specific legal problem but also threatens to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law." Id. As one appellate court concluded, when reviewing a lower court order compelling the disclosure of notes and memoranda prepared by attorneys when de-briefing their clients' current and former employees after grand jury testimony, "the control group test is not wholly adequate, that the corporation's attorney-client privilege protects communications of some corporate agents who are not within the control group, and that in those instances where the order here under attack must rest entirely upon the control group test the order is unlawful." Harper Row Publishers, Inc., v. Decker, 423 F.2d 487, 491
(7th Cir. 1970) aff'd by an equally divided court 400 U.S. 348 (1971). The court held that where employees, regardless of their rank, are in a position to take a substantial part in influencing an action that a corporation may take upon the advice of an attorney, and in fact they do so, then the attorney-client communications privilege will be extended to such employees. Thus, on the federal level at least, the attorney-client communications privilege has been extended to middle-level-and-lower-level-employees who do not qualify as members of the control group.
In rejecting the control group test and in extending the attorney-client communications privilege to communications with middle and lower level employees, courts have turned to a subject matter test that focuses on the nature of the communication — not the status of the communicator. Harper Row Publishers, Inc., 423 F.2d at 492. Under that test, "an employee, within or without the control group can make *Page 82 
a privileged communication to corporate counsel if is made at the direction of his superiors and if the subject matter upon which advice is sought is the employee's performance of his duties." SamaritanFoundation v Goodfarb, 862 P.2d 870, 875 (Ariz. 1993). However, in recognition of the under-inclusiveness of the control group test and the over-inclusiveness caused by broad interpretation of subject matter tests, courts more recently have observed "the vice of the subject matter test as it has evolved is its over-inclusiveness. It will capture statements by employees who, because of their duties, are witnesses to the conduct of others." Id.[21]
Accordingly, courts have applied a functional approach whereby the focus is on the nature, purpose, and context within which the communication occurs — thus fundamentally returning to the core elements of the attorney-client communications privilege. Samaritan Foundation,862 P.2d at 874. Specifically, in Samaritan Foundation, the Arizona Supreme Court noted: "[w]e believe that a functional approach that focuses on the relationship between the communicator and the need for legal services is truer to the objective sought to be achieved by the attorney-client privilege." Id. at 878.
In the instant case, regardless of which test or approach should be applied to communications between these particular witnesses and Providence College's associate general counsel and, further, assuming that the Rhode Island courts also would view the control group test as under-inclusive under certain circumstances, the Court first must look at the content of the communications presently at issue. The threshold question is whether the College has met its burden in establishing that either of the attorneys was *Page 83 
acting in the capacity as legal advisor and that the contested communications were made in order to generate legal advice. See Griffithv. Davis, 161 F.R.D. 687, 697 (C.D.Cal. 1995) ("A party seeking to withhold discovery based upon the attorney-client privilege must prove that all of the communications it seeks to protect were made primarily for the purpose of generating legal advice."); von Bulow,475 A.2d at 1004-05 (stating that the communication must be made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding . . .").
Therefore if Providence College has not met its burden of demonstrating that either of the attorneys was acting in the capacity as legal advisor and that the contested communications were made in order to generate legal advice, then questions about the employees' status or relationship to it and the events in question are immaterial and need not be reached by the Court. It is well settled that an attorney's communication is not protected by privilege when the lawyer is performing the work of a non-lawyer. Spectrum Systems Intern. Corp. v. Chemical Bank,581 N.E.2d 1055, 1061 (N.Y. 1991), and further, that an investigative report "does not become privileged merely because an investigation was conducted by an attorney." Id.; see also North American MortgagerInvestors v. First Wisconsin Nat'l Bank of Milwaukee, 69 F.R.D. 9, 11
(E.D.Wis. 1975) ("The possession of a law degree and admission to the bar is not enough to establish a person as an attorney for purposes of determining whether the attorney-client privilege applies.") (citation omitted); 24 Charles A. Wright et al., Federal Practice and Procedure, § 5478 at 229 (1986) (for example, "[t]he better view would seem to be that investigative work is not `professional legal services' and that no privilege applies where the lawyer's primary function is as a detective[]"). *Page 84 
As set forth in more detail earlier herein, the contents of the recorded interviews and written witness statements contained nothing to suggest that any of the College officials or employees had sought out Attorneys McGinn or Dyer for legal advice or assistance in the performance of their job duties but, instead, had been invited by the two to provide written and oral accounts of their activities and observations. Further, there is no evidence that any of them requested their statements be kept confidential, nor is there evidence that either McGinn or Dyer at any time informed them that the discussions were intended to be confidential. According to the contents of the audio-cassette recordings, neither McGinn nor Dyer gave any indication that they were acting in their capacity as legal advisors — as opposed to investigators and risk managers. None of the interviewees ever requested legal advice, and none was rendered by either McGinn or Dyer. At that time, this lawsuit had not yet been filed, and the statements and voice recordings do not reveal any specific legal issue to which McGinn or Dyer were responding, any legal question pending for them to answer, and any need to comply with some regulation or other law for which McGinn or Dyer needed to obtain certain facts. Nor do the contents of the statements and voice recordings indicate that either McGinn or Dyer was aiming to advise the witnesses or Providence College on how to go about avoiding liability in the future. Even giving Providence College and its employees credit for an overarching, implied concern about whether or not they could be held liable for Langley's death, on what grounds, and what ought to be done about that, it is plain from the statements and voice recordings, together with the context in which they were taken, that Dyer and McGinn were engaged in a factual investigation only and were memorializing the facts and information known to important bystander witnesses. *Page 85 
Furthermore, although the McPhail affidavit of November 6, 2007 suggested that attorney-client communications had taken place, the Affidavit was sparse and fell far short of demonstrating the elements needed to support that privilege claim. Nor has the College presented other evidence or facts in support of its claim of privilege whether in the form of affidavits from Dyer or McGinn, the interviewees, or the college officials who prepared the written statements. If Dyer and McGinn ever formulated or gave Providence College or its employees any legal advice or guidance in connection with the facts contained in the statements and recorded interviews, the College has not so demonstrated. Glaringly absent is any sworn statement, from the College or Dyer or McGinn, stating that the Dyer or McGinn required the information obtained from the witnesses in order to formulate a legal opinion or that they acted upon the information by providing Providence College with legal guidance on some particular issue. More specifically, Providence College has failed to demonstrate that either Dyer and McGinn required the information sought in the statements and recorded interviews in order to formulate sound legal advice for the College and its employees so as to guide their conduct in the future — for example, with respect to the dos and don'ts of premises liability law or concepts of in loco parentis. Nor has the College offered any evidence to demonstrate that either McGinn or Dyer, in fact, used the information obtained in order to formulate a legal opinion for the College — for example, whether or not one or more of the elements of a premises liability claim likely were satisfied and whether or not the Langley family's potential claim should be compromised. In fact, the evidence before the Court suggests that McGinn and Dyer did nothing more than bank the information revealed to them and ignore its existence thereafter. Or, if their purpose was to give legal *Page 86 
guidance to Providence College on how best to avoid disgorging the facts and information contained in the contested materials, they have not admitted that.
The Court concludes, therefore, that Providence College has failed to meet its burden in demonstrating that the communications memorialized in the written witness statements and in the audio-cassette recordings indeed are protected by the attorney-client communications privilege.
 B The Work-Product Doctrine 1 The Attorneys' Mental Impressions, Thought Processes, Opinions, and Legal Theories
Having concluded that Providence College has failed to meet its burden in demonstrating that the contested materials are protected by the attorney-client communications privilege, the Court must next turn to the work-product doctrine. Specifically, this Court must determine to what extent the contents of the contested materials are protected by that doctrine because they contain the mental impressions, thought processes, opinions, and legal theories of counsel.
There exist two distinct types of work-product. Henderson,966 A.2d at 1247 (quoting Cabral v. Arruda, 556 A.2d 47, 49 (R.I. 1989)). The first consists of core work-product; that is, "opinion" work-product which contains the mental impressions or legal theories of an attorney. Henderson, 966 A.2d at 1247. Such work-product "qualifies for absolute immunity from discovery and under no circumstance may another party obtain, through discovery methods, an attorney's recorded thoughts and theories." Id. Rule 26 *Page 87 
of the Superior Court Rules of Civil Procedure acknowledges the work-product privilege and "the need for protecting an attorney against discovery of memoranda prepared from recollection of oral interviews[,]" and "courts have steadfastly safeguarded against disclosure of lawyers' mental impressions and legal theories[.]" Upjohn, 449 U.S. at 400. Indeed, Rule 26 provides absolute immunity from discovery "for a writing which reflects an attorney's mental impressions, conclusions, opinions, or legal theories. . . ." Fireman's Fund Ins. Co. v. McAlpine,120 R.I. 744, 747, 391 A.2d 84, 87 (1978).
Although Providence College urges that the statements and voice recordings, in their entirety, are protected because Dyer's questions and comments reveal her thought processes, the Court's review of the contested materials reveals otherwise. After reviewing the original audio-cassette recordings, the Court finds, as it previously did with respect to the written statements and proffered transcriptions, that except for a few possible exceptions, the materials do not reflect the Providence College attorneys' mental impressions, thought processes, opinions, or legal theories. Therefore, the contested materials do not constitute protected "opinion" work-product. Further, and to the extent the materials do contain any possible reflection of the attorneys' thought processes, those portions can be redacted effectively. As set forth previously herein, the Court found Dyer's interview questions to be objective and, for the most part, unrevealing of what the attorneys were thinking. Consequently, at best, the materials constitute "factual" work-product subject to disclosure upon a showing of injustice or undue hardship. *Page 88 
 2 Hardship as Grounds for Discovery of Materials Prepared in Anticipation of Litigation
The second type attorney work-product consists of "factual" work-product which includes material gathered in anticipation of litigation other than an attorney's mental impressions. Id. "Because factual work-product does not include the actual thoughts of the attorney, it is afforded only qualified immunity from discoverability," and accordingly, it is "subject to discovery in a situation in which `the party seeking discovery demonstrates a substantial need for the materials and that it cannot obtain the substantial equivalent without undue hardship.'" Id. (quoting Crowe Countryside Realty Associates, Co., LLCv. Novare Engineers, Inc., 891 A.2d 838, 842 (R.I. 2006)). Rule 26(b)(3) of the Superior Court Rules of Civil Procedure provides:
 "Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivisions (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Super. R. Civ. P. 26(b)(3).
It is axiomatic that the burden of showing that a "privileged document nevertheless is discoverable (because of (1) a substantial need of the document and (2) a resulting *Page 89 
injustice or undue hardship from immunizing the document) lies solely with the party contesting the privilege's application." Henderson,966 A.2d at 1249. Therefore, the only remaining question is whether the contested materials, redacted of any possible reflection of attorney thought processes, opinions, legal theories, and mental impressions of counsel, should be produced to the Plaintiff on the grounds of injustice or undue hardship. See Henderson, 966 A.2d at 1249.
For purposes of this aspect of its work-product analysis, the Court accepts that the written witness statements and audio-cassette recordings were prepared by Providence College in anticipation of the instant litigation. In this context, however, the Court remains mindful that the privileges at issue herein "only protect disclosure of communications; they do not protect disclosure of the underlying facts by those who communicated with the attorney[,]" Consolidation Coal Co.,432 N.E.2d at 258, and a client "may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." Upjohn, 449 U.S. 396. Indeed, "courts have noted that a party cannot conceal a fact merely by revealing it to his lawyer." Id.; see also Gaumond, 909 A.2d at 517
(prohibiting parties from avoiding disclosure of unfavorable evidence behind a cloak of confidentiality by stating that "[a] party may not hide behind confidentiality to avoid disclosure of unfavorable evidence[]").
Accordingly, all of the facts and information banked in Providence College's institutional memory via the statements and voice recordings were discoverable, and Providence College was obligated to fully and completely disgorge them in the first instance — as opposed to requiring the Plaintiff to grope through a labyrinth of objections, *Page 90 
partial answers, seemingly endless supplementations, and mendacious statements. See Southern Ry. Co., 403 F.2d 119, 130 (quoting Hickman,329 U.S. at 507) ("A lawsuit is not a contest in concealment, and the discovery process was established so that `either party may compel the other to disgorge whatever facts he has in his possession."`). Thus
 "the fact that one party acts swiftly and first obtains the facts, by the taking of statements or otherwise, gives that party no inherent right to secrete those facts and withhold them from the adverse party. If the adverse party can demonstrate good cause for the production of these facts, the Court should order the facts to be produced." Id.
The Plaintiff's interrogatory questions to Providence College were straightforward, and if answered truthfully and forthrightly, should have netted all of the facts and information banked in the witness statements and recorded interviews. Thus the Plaintiff exercised the requisite diligence in propounding discovery requests that would secure the factual information in the College's possession. Accordingly, the most effective and reliable means for the Plaintiff to obtain the facts and information memorialized by the contested materials should have been Providence College's prompt and forthright responses to the discovery requests. However, Providence College and Sicard's responses presented only a small fraction of those facts and that information, including the facts and information contained in the College's own version of the transcripts. As a result, their recalcitrance prevented the Plaintiff from timely learning probative details, highly damaging to the College, and which, if admitted to by Sicard, well may have eliminated any meaningful dispute about one or more essential elements of the Plaintiff's claim.
Plainly, full and accurate answers would have spared the Plaintiff the time lost in unnecessary interviews and depositions. More importantly, however, full and accurate *Page 91 
answers that admitted the factual content contained in Providence College's institutional memory, and imputed to the College by way of its employees, would have saved the Plaintiff from having to rely on the accuracy of the individual witnesses' recollections, their candor, or the efficacy of deposition questions framed against the backdrop of misinformation put forth by the College. See Southern Ry. Co.,403 F.2d at 128 (citation omitted) (observing that with the lapse of time, "the memories of the witnesses involved would necessarily be dimmed with reference to the specific details of the events about which they originally had made statements[]"). As has been noted by courts in the context of the attorney-client communications privilege in the corporate context, ". . . the knowledge of a corporate agent is imputed to the corporation if it is acquired by the agent within the scope of his or her employment and relates to a matter within his or her authority."Samaritan Foundation, 862 P.2d at 876.
Further, the collective knowledge of corporate employees is imputed to the corporation regardless of whether the information is obtained by a single employee or by several employees who did not comprehend the full import of their knowledge. See United States v. Bank of New England,N.A., 821 F.2d 844, 856 (1st 1987) (observing that "[A] corporation cannot plead innocent by asserting that the information obtained by several employees was not acquired by one individual who then would have comprehended its full import."). Additionally, a corporation's collective knowledge is the "totality of what all of the employees know within the scope of their employment." Id. Finally and specifically with respect to statements against interest made by Residential Assistant Edmund St. John, Hall Director Ernest McNair, and College Vice President Kenneth Sicard, ". . . statements made by an employee or agent concerning a matter *Page 92 
within the scope of the agency or employment, made during the existence of the employment relationship, are directly admissible against the corporation as the admission of a party opponent." See SamaritanFoundation, 862 P.2d at 876; see also R.I. R. Evid. 801 (d)(2)(D) (defining as not hearsay "a statement by the party's agent or servant concerning a matter within the scope of the party's agency or employment, made during the existence of the relationship").
It is apparent that the Plaintiff in this case has not been able toreliably obtain the information contained in the contested materials through the accepted means of propounding legitimate discovery requests to Providence College. Furthermore, Providence College's Tenth Supplemental Answers offer little assurance that the Plaintiff will be able to obtain complete and accurate factual details from Providence College or its employees in the future and there is no way of confirming whether the College possesses additional recordings, notes, memoranda, or sources of information that have yet to be revealed.
Even assuming ineptitude rather than calculation caused Providence College to omit precious facts and information from its discovery responses — or that Lema, Sicard, McGinn, Dyer, and three seasoned litigators with the prestigious law firm of Hinckley Allen Snyder, LLP were all were guilty of mere sloppiness only — the hardship to the Plaintiff is evident. Contrary to Providence College's arguments concerning the Plaintiff's lack of hardship, what speaks loudest is that after more than three years of litigation and nine supplemental discovery responses, Providence College failed to admit the treasure trove of facts and information contained in the voice recordings and witness *Page 93 
statements. Then, more than a year later, when it finally produced its Tenth Supplemental Answers, Providence College continued to omit material facts and information.
Providence College contends that the witnesses were available for deposition and blames the Plaintiff for not having taken those depositions earlier. However, this argument ignores the very discovery responses that undoubtedly must have caused delay in prioritizing the scores of potential witnesses in this case and which obfuscated the information they possessed. More importantly, the College's argument ignores that the Plaintiff was entitled to the College's admissions concerning facts imputed to it, as opposed to relying on the witnesses' subsequent recollection of the events. Illustrative of the results of the College's failure to disgorge essential facts are the circumstances surrounding the April 5, 2007 deposition of physical plant employee Carl Russo. Up to that point, the College's disclosure about Russo's observations made in December 2002 was contained in its April 4, 2006 Second Supplemental Answers. The disclosure was limited and stated that Russo had "facts and information regarding the condition of the door to the attic, the attic, and the cupola, on December 4, 2002 because he accessed the attic on that date with a roofing consultant in order to take some pictures of Guzman Hall." (Answer to Interrog. No. 2, April 4, 2006.) During the deposition, the Plaintiff's attorney focused on Russo's observations concerning the attic windows that opened onto the roof and attempted to determine whether the College was on notice that they had been broken or removed — examining him aggressively about whether he had seen pigeons in the attic or observed any bird droppings. It was more than two years after Russo's deposition was taken that Providence College finally acknowledged that on December 4, 2002, Russo discovered a ten speed bicycle in the attic. *Page 94 
The history and substance of the College's discovery responses evidence a pattern of obfuscation, concealment, and delay in the disclosure of material facts and information possessed by these witnesses, and as such, the Plaintiff's hardship was hardly self-induced. Moreover, with the lapse of time now having called the witnesses' memories into question, the only remaining means of obtaining the facts within their knowledge and imputed to Providence College might well be for the Plaintiff to press Providence College on requests to admit facts and information preserved in its institutional memory and imputed to it — something the Plaintiff cannot do without the statements and voice recordings and even assuming such a course of action would prove effective given the overall circumstances.[22]
To be sure, a factor in assessing hardship is the proximity in time of a particular incident to the making of the statement, the rationale being that such proximity lends unique value to the statement. SeeFireman's Fund Ins. Co., 120 R.I. at 756, 391 A.2d at 91. This is because such statements "provide[] an immediate impression of the facts, an on-the-spot account, as it were, which can never really be recreated by other means." Id. However, where statements are given some time after the incident, more may be required before courts are prompted to order the production of such materials. Id. 120 R.I. at 757, 391 A.2d at 91.
Here, Providence College employees' statements and interviews contain a mix of contemporaneous accounts of recent events together with the witness past recollection of other, predicate events. Although the witnesses may be available for deposition or re-deposition, the lapse of time since the taking of the statements, including the aspect of the *Page 95 
witnesses' past recollection, makes the statements and voice recordings all the more valuable under the circumstances shown here. So, too, these critical witnesses are or were Providence College employees and may well carry loyalties to the College such that if deposed, they may not be entirely candid in their answers. Thus their statements, contemporaneous with Langley's death, are all the more important even if some portions of them are more attenuated from the events than others. Southern Ry. Co.,403 F.2d at 128 (observing that the appellant's employees "may be expected to be somewhat reluctant to answer fully questions propounded by one pursuing a cause of action against their employer . . . [and] the employment relationship would appear to create a situation of inequality between the parties with respect to gathering accurate statements from the [appellant's employees]"). For this reason also, and given the facts already revealed about Providence College's methods in preparing the witnesses for giving testimony, these witnesses' statements could be of critical importance at trial to refresh recollections or as past recollection recorded and corroborating evidence. The statements also have high impeachment value, including with respect to the Vice President of the College and Dean of Residence Life, Reverend Kenneth Sicard, who potentially might be examined adversely about the College's knowledge about prior events and observations, challenged on his sworn answers to the Plaintiff's interrogatory questions, and challenged on his reliance on the College's purported transcripts.
Finally, the written statements and recordings contain small details, yet to be acknowledged by Providence College, which could be of unique value. For example, the existence of graffiti stating, "John was here," and "We got into the attic in `02," might permit the Plaintiff to question whether or not Providence College acted prudently in *Page 96 
attempting to identify the culprits and could have imposed disciplinary sanctions that might have deterred further misbehavior. Or, for example, Kevin Hillery's decision to leave for a College Christmas party rather than to take steps to confirm whether Martin Toupin had completed the work order might serve as impeachment material or permit the Plaintiff to advance other arguments concerning the College's alleged negligence. Plainly, the statements and voice recordings have unique value, and the Plaintiff will suffer undue hardship without them.
Truly, there is no better evidence of the Plaintiff's hardship than Providence College's ten sets of discovery responses and the contents of its employees' depositions. Plainly, the Plaintiff has met his burden in demonstrating that he is unable to obtain substantially equivalent material by other means. Accordingly, the written statements and accurate transcripts of the witness interviews must be produced to the Plaintiff, redacted of material possibly reflecting attorney mental impressions and legal theories.
 IV Fraud on the Court; Super. R. Civ. P. 11; Super. R. Civ. P. 26; Super. R. Civ. P. 37
Concepts of fraud on the court long have been recognized in Rhode Island. In fact, the State's legislature has assigned criminal penalties to fraudulent conduct such as perjury, G.L. § 11-33-1; obstruction of justice, G.L. § 11-32-3; filing false documents, G.L. § 11-18-1; and editing, altering, or tampering with any tape or transcription submitted in connection with a judicial proceeding, G.L. § 11-35-22. Such penalties have been assigned because of the effect fraud has on the judicial process itself and the *Page 97 
integrity of the normal process of adjudication that is core to the American system of justice.
So, too, the Court's inherent authority, as well as Rules 11, 26, and 37 or the Superior Court Rules of Civil Procedure, is available to redress bad faith and mendacity in civil litigation. Lett v. ProvidenceJournal Co., 798 A.2d 355 (R.I. 2002). In that context, the Rhode Island Supreme Court has adopted a broad definition of the offense of fraud on the court:
 "[a] `fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability to impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Id. at 364 (quoting Auode v. Mobile Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989)).
As also explained in 12 Moore's Federal Practice, 3rd Ed., § 60.21[4][a],
 "`Fraud on the court' is defined in terms of its effect on the judicial process, not in terms of the content of a particular misrepresentation or concealment. Fraud on the court must involve more than injury to a single litigant; it is limited to fraud that `seriously' affects the integrity of the normal process of adjudication. Fraud on the court is limited to fraud that does, or at least attempts to, `defile the court itself' or that is perpetrated by officers of the court `so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases.'" (Emphasis in the original.)
 Conduct constituting fraud on the court is not limited to conduct occurring during trial. Indeed, fraud on the court may occur in the context of discovery proceedings. Combs v. Rockwell Int'l Corp., 927 F.2d 486, 488 (9th Cir. 1991), cert. denied 502 U.S. 859
(1991); Lett, 798 A.2d at 367; Leo's Gulf Liquors v. Lakhani, 802 So.2d 337, 343 *Page 98 
(Fla.App. 2001); Crosley Radio Corp. v. Hieb, 40 F. Supp. 261, 264
(S.D. Iowa 1941) (holding that perjurious interrogatory answers or those that show that condition of recalcitrancy in failing to fully answer may amount to an obstruction of justice and contempt of judicial authority);see also J. A. Bock, Annotation, Perjury or False Swearing as Contempt, 89 A.L.R. 2d 1258 (1963 Supp. 2003). As observed by the courts,
 "Witnesses who give sworn testimony by way of [interrogatories], swear and affirm to tell the truth, the whole truth, and nothing but the truth. We expect and will settle for nothing less. Lawyers who advise their clients to hold back on necessary clarifications, or otherwise obstruct the truth-finding process, do so at their own, and their client's peril." Leo's Gulf Liquors, 802 So.2d at 343
(emphasis in original); Deyo v. Kilbourne, 84 Cal. App. 3d 771, 783 (1978); Hunter v. Int'l Sys Controls Corp., 56 F.R.D 617, 631 (W.D. Mo. 1972).
Further, "where the question is specific and explicit, an answer which supplies only a portion of the information sought is wholly insufficient. Likewise, a party may not provide deftly worded conclusory answers designed to evade a series of explicit questions, Deyo,84 Cal. App. at 783 (citing In re Professional Hockey Anti-TrustLitigation, 63 F.R.D. 641, 650-654 (E.D. Pa. 1974)), and "a party may not deliberately misconstrue a question for the purpose of supplying an evasive answer." Id. (citing Hunter, 56 F.R.D. at 625).
The record in this case evidences quite the opposite of Providence College's attorneys' representation to this Court that
 "Defense counsel, in coordination with the Office of General Counsel, has worked diligently to collect, review, organize, and produce all factual information that relate in any way to the claims and defenses in this case." (Emphasis added.) (Def.'s Mem. in Opp'n 10.); *Page 99 
that they had
 ". . . provided lengthy summaries for each of the approximately ninety (90) fact witnesses it has identified. Consistent with these efforts, the Defendant has provided detailed summaries for the [witnesses] identified in the privilege log, . . ." Id. at 10;
and that
 "The Defendant has fulfilled all of its discovery obligations by providing the Plaintiff with the factual information in its possession relating to these [witnesses] as well as to all other fact witnesses about which it has knowledge." Id. at 11.
In fact, the record demonstrates that Providence College worked very diligently to avoid disgorging facts and information in its possession and critical to essential elements of the Plaintiff's claims against it. Not only did Providence College, Sicard, and Lema fail to disclose the discoverable information omitted from the recorded interview transcriptions, but it also failed to disclose those that, in fact, werecontained within them and the witnesses' written statements. Therefore, there is simply no excuse for their failure to disgorge the information. Further, when viewed in their totality and in the context of the ongoing discovery dispute in this case, Providence College's interrogatory answers appear to have been artfully crafted and, together with the timing and sequence of the answers, evidence an overall scheme designed to obscure and confuse the truth about what the College knew, among other things, regarding students using the attic as an unauthorized retreat. The skillfully wrought and obfuscating answers evidence a pattern of recalcitrance amounting to the obstruction of discovery in this case. It seems evident that it could only have been with much calculation that the College avoided revealing the existence of the contested materials and for so long refused to reveal all of the facts and information memorialized in them. *Page 100 
As Reverend Kenneth Sicard stated when on April 4, 2006, he provided Providence College's Second Supplemental Answer to No. 26, detailing the facts and information pertaining to the College's affirmative defenses: "John Langley had to work very hard to put himself at his peril. . . ." (Answer to Interrog. No. 26, April 4, 2006.) Similarly, it seems unlikely that the content, sequence, timing, and juxtapositioning of Providence College's highly nuanced, carefully parsed, misleading, mis-informative, and mendacious discovery responses were the product of ineptitude or mere coincidence. Rather, Providence College had to work very hard to keep from producing the simple facts and information contained in the contested materials.
So, too, the coincidences surrounding Providence College and its attorney's submissions to this Court; the manner in which they used the oldest and most time honored privilege claims to shield discoverable facts; their selective supplementation of the College's discovery responses; and their facilitation of Sicard's and Lema's artful and misleading discovery responses — all evidence a pattern aimed squarely at the adjudicatory process. Of special concern, too, is the College's attorneys' attempt to influence the outcome of the instant proceedings and the case itself by representing that they, themselves, had worked diligently to provide the Plaintiff with the facts and information memorialized by the statements and interviews. By pointing to their personal efforts as attorneys at law, they stood upon their status as officers of the court, inviting the Court to respect and rely upon their representations as such. This is especially egregious in the context of an overburdened court system in which the trial court judges routinely are required to rely upon the representations of counsel as being asserted in good faith with a good faith basis. It is for just this reason that Article V, Rule 1.2(d) of *Page 101 
the Supreme Court Rules of Professional Conduct prohibits an attorney from facilitating a client's fraud and requires attorneys to withdraw from representation of a client who is engaging in fraudulent conduct. Further, Article V, Rule 3.3 of the Supreme Court Rules of Professional Conduct demands that a lawyer shall take remedial measures if he or she knows that a person has engaged in fraudulent conduct related to the proceeding, including, if necessary, disclosure to the tribunal. See
Article V, Rule 3.3 of the Supreme Court Rules of Professional Conduct. Plainly, had the law not required the Court to articulate findings about the content of the contested materials and therefore required it to call for those materials for in camera review instead of relying on the attorneys' representations, the facts and information contained in the contested materials may never have come to light.
Likewise, Providence College's actions with respect to its attempt to wrest jurisdiction from this Court speak loudly. The College's manipulation of Court employees and the appellate process, together with its disregard of the rules and practices of the Superior and Supreme Courts, smacks of the same masterminded skill it deployed when avoiding its discovery obligations. As noted previously herein, the College's appeal was triggered by the Order, entered June 3, 2008. Accordingly, any deadline for filing such an appeal was looming. On the other hand, the College's petition for writ of certiorari could have been filed at any time without risk of being dismissed as untimely filed. Yet the Collegefirst filed its petition, record Appendix, self-styled "notice" copy, and motion for stay beginning at 4:16 p.m. on June 23, 2008, and, thereafter, delivered the official form Notice of Appeal to the Superior Court clerk, together with its self-styled "notice" — thus allowing the College's representative to finesse the status of the *Page 102 
transcripts and somewhat colorably pretend to the clerk that, "Fees Paid Transcripts Ordered Received Notices Sent," such that the clerk could transmit the record immediately to the Supreme Court for docketing. This coincidence of timing in the face of the rapidly approaching filing deadline reflects the same proficiency of thought demonstrated by the orchestration of the discovery responses.
Worst is the content of Tape #1, Side B. Its contents are so scaldingly "hot" that it is near-impossible to imagine that all three-Dyer, McGinn, and Sicard-genuinely forgot this information or overlooked it in the absence of a written transcript to remind them about it, especially in view of the fact that as Providence College's attorneys so passionately represented to the courts of this State, these three began preparing to defend a lawsuit within hours after John Langley had died. During his interview, St. Joseph Hall Director and member of the College's Residence Life Central staff, Ernest McNair, described the sources of his knowledge and the details of his observations concerning students accessing the attic in previous years. He did so clearly and unambiguously and in no uncertain terms. Similarly, the interviewees detailed the defects in the attic door's security, the College officials' awareness of the defects, and the final, missed opportunity for the College to remedy any defect and secure the door just hours before John Langley fell. It defies logic that all three of them would forget this information, its significance, or the very fact that it had been revealed in their presence. More likely, they would have wanted to prevent the information from surfacing.
As set forth previously herein, the majority of the missing information and dialog contained in the audio-cassette recordings was audible and shared a commonality of subject matter. Even assuming that its omission from the College's version of transcripts *Page 103 
was the product of coincidence and inadvertence, it is difficult to imagine that all three of these College officials would have forgotten so much of the information revealed to them and that information of such consequence had been revealed in their presence at all — such that all three failed to notice information might be missing from the interrogatory answers or the transcripts, or that the audio-cassette recordings had been badly transcribed. Or that Dyer, who personally checked the transcripts for accuracy and made note of the substantive content of Tape #1 within days, merely overlooked that critical dialog and information were missing from the transcriptions presented to her. To the contrary, Dyer's handwritten notes appearing on the Providence College's transcripts submitted to the Court make it plain that her review of their contents was as thorough and detailed as her interviews. Finally, it is difficult to imagine that none of the attorneys took the trouble to listen to the audio-cassette recordings as they went about ignoring Rule 26 (b)(5); Rules 26 (e)(1), (2), and (4); and Rule 33 (c) of the Superior Court Rules of Civil Procedure — adherence to which required them to reveal the fact of the recordings' existence.
The origin and evolution of Providence College's machinations, the different twists and turns its strategies may have taken over the years since the College realized it might be sued, and the number of individuals involved may never be fully understood. However, it appears as if in motion was a general plan to influence the outcome of this litigation by concealing or obscuring discoverable facts and information — a plan which was facilitated or abetted by the information missing from the audio tape transcriptions.
For example, the transcript files of the recorded statements were maintained electronically, such that the Tapes #1 and 2, Side A references to McNair could have *Page 104 
been edited and the Tape #1, Side B transcription deleted at any time. Or, an affirmative decision could have been made not to transcribe certain portions of those recordings in the first instance. Telling is the fact that McNair clearly and plainly identified himself at the start of Tape #1, Side A, such that there could be no mistaking when he spoke thereafter. Yet, that part of the dialog was completely omitted from the College's proffered transcript and thereafter, his statements were attributed merely to "?". When viewed in light of the fact that Tape #1, Side B went missing altogether, the omission of any link contained in Side A to the existence of Side B speaks loudly of calculation — as does the tidying up of both sides of Tape #2.
Equally as sadly, Providence College's sudden production of Ernest McNair's written statement and its subsequent inclusion of the statement in the materials proffered to the Court are suggestive of intentional efforts both to hide how important a witness he might be and, later, to account for McNair's purported failure to speak during the interview.
Furthermore, even assuming mere inadvertence in transcription and inexplicable forgetfulness on the part of Dyer, McGinn, and Sicard, an important signpost was Providence College's failure to reveal the very existence of the audio-cassette recordings and the two written witness statements directly at issue herein. Other important markers include Providence College's failure to disgorge the other important facts and information that had not been omitted from its own version of the transcripts. Thus, regardless of whether the deficiencies in the transcriptions occurred early on, thereby causing or allowing others to conceal information, or whether they were undertaken later, in fear of their potential disclosure, and regardless of the different directions Providence *Page 105 
College's path actually may have taken, the ultimate result is the same. Providence College appears to have determined to conceal or obscure the truth about discoverable facts and information and thereby influence the outcome of the judicial process.
At this juncture, the extent to which any one of the College's various attorneys, employees, and officials may have believed the interrogatory answers were misleading or false or who may have participated in a fraud upon the Court or attempted to obstruct this Court's administration of justice cannot be discerned. Whether they actively participated in a fraud, acquiesced in one, or merely failed to take the basic steps that would have averted it in the first instance also cannot be discerned upon this record.
Regardless, questions about what should be done about Providence College's conduct in failing to respond to the Plaintiff's legitimate discovery requests is beyond the scope of this Decision. Ultimately, Providence College might prevail in its efforts to protect the contested materials, and ordering the College to make new or additional responses to the discovery requests may or may not suffice. Moreover, there is no way to confirm whether there are other witnesses, witness statements, documents, materials, or other information that Providence College has not yet revealed and no assurance that Providence College would be truthful in its future responses. It cannot be ignored that the College's cover up appears to have taken place at the highest levels of its administration. Moreover, even if the contested materials are finally ordered produced, the litigation in this case has become unnecessarily protracted and trial delayed, both of which cause inherent harm to the litigants, the truth-seeking process, and the cause of justice. *Page 106 
 V V Conclusion
Plaintiff's Motion to Compel Documents Withheld Under Claim of Privilege must be granted. Further, because the actual contents of the audio-cassette recordings differ from what previously was submitted to the Court by Providence College, but upon which the Court's earlier orders were premised, and because Providence College has since divulged additional information, the Court has revisited the question of what materials should be redacted. Accordingly, the Court incorporates Exhibits No. 1-14 into this Decision in which the Court's final determinations, as to redactions, are memorialized.
Exhibit Nos. 12 and 13 shall be produced to the Plaintiff 30 days from the date of this Decision, absent Providence College's filing the appropriate application for appellate review in the Rhode Island Supreme Court. Should the College indeed seek appellate review, the Court's order of production shall further be stayed pending a final resolution in the Rhode Island Supreme Court or as otherwise directed by it. With respect to Kevin Hillery's December 15, 2002 written statement, that statement likewise shall be produced but in un-redacted form and in its entirety, for the reason that all of its contents, including the previously ordered redactions, have been revealed by Providence College.
The parties are directed to prepare the appropriate order referencing this Decision.
The Court declines to determine, at the present time, if Providence College's version of the transcripts or the original audio-cassette recordings, in digitally remastered and then redacted form, should be produced to the Plaintiff. *Page 107 
 EXHIBITS TO DECISION
As part of the record of this motion, the following Exhibits have been filed, under seal, pending the outcome of all appellate review of this Court's ruling with respect to the disclosure of the contested documents:
Exhibit 1: Letter of Attorney Kristie M. Passalacqua, dated January 2, 2008, with enclosed revised privilege log.
Exhibit 2: Letter of Attorney Kristie M. Passalacqua, dated January 14, 2008, with enclosed case law and copies of revised privilege log items #3, 6, 8, 9, 13, 15, and 17.
Exhibit 3: Providence College's January 14, 2008 bound submission juxtaposing revised privilege log items #3, 6, 8, 9, 13, 15, and 17 with Providence College's discovery responses.
Exhibit 4: Plaintiffs Documents Produced to Judge Patricia A. Hurst (pursuant to April 4, 2008 Request).
Exhibit 5: Letter of Attorney Kristie M. Passalacqua, dated May 19, 2008.
Exhibit 6: Letter of Attorney Kristie M. Passalacqua, dated May 21, 2008, with enclosed transcript of Tape #1, Side B.
Exhibit 7: Letter of Attorney Kristie M. Passalacqua, dated May 22, 2008.
Exhibit 8: Letter of Attorney Kristie M. Passalacqua, dated June 11, 2008, with enclosed ASCII disk and transcripts.
Exhibit 9: Copy Supreme Court Notice of Appeal.
Exhibit 10: Letter of Attorney Douglas Seaver, dated July 2, 2008, with enclosed Rhode Island Supreme Court NOTICE.
Exhibit 11: Six transcriptions entitled PROVIDENCE COLLEGE'S ORIGINAL AUDIO-CASSETTE RECORDING AS LISTENED TO BY THE HONORABLE JUSTICE PATRICIA A. HURST (Tape 1 — Side A; Tape 1 — Side B; Tape 2 — Side A; Tape 2 — Side B; Tape 3 — Side A; Tape 3 — Side B) each highlighted as follows:
 • Words not appearing in Providence College's proffered transcriptions are highlighted in red.
Exhibit 12: Six transcriptions entitled PROVIDENCE COLLEGE'S ORIGINAL AUDIO-CASSETTE RECORDING AS LISTENED TO BY THE HONORABLE *Page 108 
JUSTICE PATRICIA A. HURST (Tape 1 — Side A; Tape 1 — Side B; Tape 2 — Side A; Tape 2 — Side B; Tape 3 — Side A; Tape 3 — Side B) each highlighted as follows:
 • Statements and questions possibly reflecting attorney though processes and which are to be redacted are highlighted in yellow.
Exhibit 13: December 13, 2002 written statement of Vice-President and Chief Financial Officer Michael V. Frazier, entitled Observations of St. Joseph's Hall, highlighted as follows:
 • Statements and questions possibly reflecting attorney though processes and which are to be redacted are highlighted in yellow.
Exhibit 14: Three micro-cassette audio tapes.
To ensure safe-keeping and with no disrespect meant to the employees of the Office of the Clerk of Court, the original Exhibits, including the three-cassette tape recordings at issue, are to be deposited with the Superior Court Administrator, to be kept in the Grand Jury evidence room located on the fourth floor of the State of Rhode Island Licht Judicial Complex. A copy of Exhibit Nos. 1 through 13 have also been filed, under seal, with the Clerk of the Superior Court.
[1] Revised Privilege Log Items are 3 (Memorandum from Michael V. Frazier entitled, Observations of St. Joseph's Hall); 6 (Memorandum from Mr. Kevin Hillery entitled, Memorandum); 8 (Untitled transcript of Gail Dyer, Esq.'s meeting with Edmond St. John, Ernest McNair, Kevin Hillery, and Rev. Kenneth Sicard, O.P.); 9 (Incomplete transcript of Gail Dyer, Esq.'s meeting with Rev. Kenneth Sicard, O.P.); 13 (Untitled transcript of Gail Dyer, Esq.'s meeting with David Petit); 15 (Untitled, incomplete transcript of Gail Dyer, Esq.'s meeting with Martin Toupin); and 17 (Untitled transcript of Gail Dyer, Esq.'s meeting with David Marshall).
[2] As later explained by Providence College trial counsel Attorney Kristie M. Passalacqua in her May 22, 2008 letter to the Court, the original transcriptions were maintained by Providence College electronically. The handwritten dates appearing on the Court's copy of the print-out were copies of "Post-it notes" that had been placed on the print-outs by the College's secretary at the time she printed them for Attorney Dyer's review.
[3] Unlike the copies submitted to the Court with Seaver and Passalacqua's letter, the transcript copies contained in this volume did not bear the dates of transcription, thus causing the Court to request clarification.
[4] The discovery requests and responses are set out, in detail, in section II D hereof. As explained more specifically there, the supplemental disclosure with respect to these two witnesses occurred on January 9, 2008.
[5] As detailed more specifically in section II D hereof, Providence College made its initial disclosure with respect to Martin Toupin on April 4, 2006.
[6] E.g. "Woman: What time is it?" "Man: I don't know." "Man: I have the time." "Woman: It's 2:30."
[7] American Standard Code for Information Interchange.
[8] The term is commonly used when referring to transcripts prepared by the court reporter in response to an informal request from counsel.
[9] Article I, Rule 10 (b)(1) of the Supreme Court Rules of Appellate Procedure mandates: "The ordering and payment of the copies of the transcript shall be in accordance with the rules of the trial court." Article I, Rule 10 (b)(2) also mandates: "Upon completion of the transcript, the person who prepared the transcript shall transmit it forthwith to the office designated by the rules of the trial court for ordering transcripts. If that office is not the Clerk of the Court, then an agent of such office shall deliver the transcript to the clerk of the court for transmission with the record. When the stenographer or other proper party completes and delivers the transcript, he or she shall notify the person who ordered the transcript that it has been completed and delivered."
In keeping with this, Rule 3.5 of the Superior Court Rules of Practice requires all parties to order transcripts through the office of the Superior Court administrator. See also Superior Court Administrative Order No. 82-13. This is accomplished by way of a pre-ordained order form. See Order for Transcript Form, revised January 26, 2004. The form must be signed by the attorney for the appellant and countersigned by the Deputy Superior Court Administrator. See id. As noted on the form, the Deputy Superior Court Administrator transmits the order form to the court reporter and files a copy of the order form with the Clerk of Court. Seeid. Thereafter, and upon completing the official transcript, the court reporter, acting as agent of the Court Administrator and the Clerk of Court, delivers the transcript directly to the Clerk of the Supreme Court and obtains a written receipt from that Clerk. See Article I, Rule 10(b)(2) and Transcript Receipt Form. Contemporaneously, the court reporter or other proper party sends formal notice to the appellant that the transcript has been filed with the Supreme Court. See id. A copy of the notice is filed with the Superior Court Clerk, thereby confirming that the official transcript has been properly ordered and transmitted and the fees paid. See id. and Rule 3.5 of the Superior Court Rules of Practice. It is the receipt of that notice that triggers the transmission of the case file and, ultimately, docketing of the appeal. See Article I, Rule 10(a). This procedure ensures that the Supreme Court receives an official and unaltered version of the proceedings below and one which clearly indicates what, if any, portions of any given hearing were not transcribed in full. See id. Importantly, the procedure also gives the court reporter and the trial Court the opportunity to verify the accuracy of any daily transcripts that the court reporter may have previously certified. See Article I, Rule 10(f). Finally, the procedure also ensures judicial oversight of and compliance with the Supreme Court's strict rules governing the time for ordering transcripts and transmitting the record. See id.. Within that context, the trial Court and the parties have the opportunity to correct, modify, or agree upon the record on appeal. See id.
[10] Attorney Seaver was unaware that this Court had secured the audio-cassette recordings in a safe location in chambers, separate from the case file, and as a result of the hurried removal of the case file to the Supreme Court, they had not been transmitted to the Supreme Court along with the case file.
[11] These witnesses have discernable voices, accents, and ways of speaking.
[12] The fact of this conversation was memorialized in Michael V. Frazier's written statement of December 13, 2002.
[13] Super. R. Civ. P 26(b)(5) provides:
 "Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows: . . . (5) Claims of Privilege or Protection of Trial Preparation Materials. When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection."
[14] Regretfully, it has become a common ploy for attorneys practicing before the Rhode Island Superior Court to provide an incomplete answer to an interrogatory question by means of asserting the information is being produced "notwithstanding objection" and thus obscuring, if not completely hiding, the discoverable facts and information to which the objection does not legitimately pertain. The result is worse than no response at all. When there is no response to an interrogatory question or where a bona fide objection is interposed, but with it, the non-objectionable information is identified as such and represented to be produced in full, the party serving the interrogatory at least knows the extent to which it has not received an answer. Where an incomplete answer "notwithstanding objection" is given, the party serving the interrogatory is unable to determine the extent to which it has received the answer and, further, those who are unacquainted with the tactic are lulled into believing they have received an answer. This tactic of answering "notwithstanding" objection has, at least in the Rhode Island Superior Court, helped to give motion practice a life of its own, spawning countless motions and objections and a seemingly endless waste of time and resources. Providence College's response to Interrogatory No. 9 and its other responses made "notwithstanding objection" are solid examples of how this strategy works.
[15] See Answer to Interrog. Nos. 2, 7, 9, April 4, 2006. Interrogatory No. 7 asked:
 "Identify all individuals (and their relationship with Providence College) who performed work of any type on the door and doorway leading to the attic, the cupola, or the roof of St. Joseph Hall after December 13, 2002 to and including June 30, 2003, including those individuals who installed a lock on the door leading to the attic and repaired the window in the cupola of St. Joseph Hall."
[16] Given the form and content of the two documents, that claim of privilege was patently frivolous and could not have been interposed for any proper purpose. Super. R. Civ. P. 11. Providence College withdrew the privilege claim only after oral argument on the instant motion had begun.
[17] Notably, it was these sanitized discovery responses that Attorney Seaver used approximately 60 days later to prepare both Petit and Marshall for their depositions.
[18] See Letter of Kristie M. Passalacqua, dated May 19, 2008.
[19] Providence College's first interrogatory response concerning John Dunbar was provided on April 4, 2006 in the College's Second Supplemental Answers. For Dunbar, the College stated: "John Dunbar has facts and information regarding the incident that occurred on December 13, 2002 because he was one of the many individuals who responded to the scene during the early morning hours of December 13, 2002." (Answer to Interrog. No. 2, April 4, 2006.)
[20] Providence College's only previous interrogatory response concerning Carl Russo was provided on April 4, 2006 in the College's Second Supplemental Answers to Plaintiff's First Set of Interrogatories. For Russo, the College stated:
 "Carl Russo, in his capacity as an employee of the Physical Plant Department, had information and facts regarding the condition of the attic and the cupola on March 27, 2002 because he accessed the attic with an employee of Monaco Restorations, Inc. so that the employee could remove three antennas from the roof. Mr. Russo also has facts and information about the condition of the door to the attic and the attic on August 15, 2002 and August 29, 2002 because he accessed the attic on those dates with a roofing consultant and several contractors regarding the bidding process for a gutter replacement project. Mr. Russo has facts and information regarding the condition of the door to the attic, the attic, and the cupola on December 4, 2002 because he accessed the attic on that date with a roofing consultant in order to take pictures of Guzman Hall." (Answer to Interrog. No. 2, April 4, 2006.)
[21] Importantly, even courts that have applied a subject matter test have avoided addressing situations in which the employees whose communications at issue also are bystander witnesses. See Harper RowPublishers, Inc., 423 F.2d at 491 (declining to express an opinion with respect to "communications about matters to which they are virtually indistinguishable from bystander witnesses; employees who, almost fortuitously, observe events, which may generate liability on the part of the corporation").
[22] Indeed, pursuant to Super. R. Civ. P. 36, the Plaintiff propounded requests for admissions as this Decision was nearing completion. Questions concerning the sufficiency of the College's responses are still outstanding.